# HIDEYOSHI OTANI AND FAIR CONTRACTING COMPANY, LIMITED *v.* CONTRACTORS LICENSE BOARD OF THE STATE OF HAWAII, AND STATE OF HAWAII, BY ITS ATTORNEY GENERAL.

## No. 4840.

MARCH 13, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE HAWKINS FOR KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY RICHARDSON, C.J.

In this case, the Contractors License Board appeals from the decision of the Circuit Court which held invalid all actions of the Board with regard to appellees Otani and Fair Contracting Co., Ltd. Issues are raised about

rule-making and licensing procedures under the Administrative Procedure Act, HRS Chapter 91, and under the Contractors License Board Act, HRS Chapter 444 which together govern the activities of the Contractors License Board.

Appellees, hereinafter referred to as Otani, had for many years been engaged in the business of digging trenches for underground ducts and conduits and erecting new and replacement poles for Hilo Electric Co., and Hawaiian Telephone Co. on the island of Hawaii. They held licenses as specialty contractors in four areas: Asphalt Paving and Surfacing (C-3), Cement and Concrete (C-8), Concrete Paving and Surfacing (C-10), and Excavating, Grading and Trenching (C-17). They dug holes and trenches, planted anchor slugs, and planted and erected poles for electrical and telephone lines. In March and April, 1967, Otani received letters from the Contractors License Board notifying him that the Board was planning to consider whether to adopt a new classification for the type of work he had been doing, in the interest of public safety. He was advised that if he wanted to continue to do any work not specifically covered in his existing licenses he ought to apply for a new license and describe the sort of work he wanted to do.

In May, Otani applied. He submitted affidavits with his application from himself and from various companies that had employed him, stating that his work had always been done in a safe, competent, and satisfactory manner.

In August, 1967, the Board announced that it would hold public hearings on the question of whether the public safety would be jeopardized by allowing persons other than electrical contractors to plant new and replacement poles. The hearings were held in Honolulu in August and September, 1967. Otani did not attend the hearings, but he did submit affidavits for the Board's consideration.

In accordance with the conclusions it had drawn from these hearings, the Board in December, 1967, and January, 1968, adopted several new classifications. One of these was "C-13A, Pole and Line Contractor", which was to include the entire job of erecting new and replacement poles, including everything from digging holes to stringing wires. As a prerequisite to obtaining a C-13A license, one first had to have a C-13 Electrical Specialty license.

Then, in January, 1968, Otani was notified that he had been granted a limited C-68 license, allowing erection of poles in new lines only; replacement of poles was prohibited. At no time was Otani given a hearing on the question of the Board's proposal to refuse the license he had requested.

Otani appealed this action of the Board to the Circuit Court by filing a notice of appeal and a statement of the case, pursuant to HRS §§ 444-19 and 91-14 and H.R.C.P. Rule 72(e). These pleadings contested the Board's decision to prohibit Otani from replacing poles. The court held in Otani's favor and against the Board, voiding all actions of the Board with reference to Otani. Going beyond the pleadings, and beyond the designated record on appeal, the Circuit Court also held that Otani would be allowed to do certain work involving underground ducts and conduits.

The Board appeals to this court, arguing that the new classifications were both validly adopted and validly applied to Otani. We disagree.

For the following reasons we affirm in part and reverse in part the Circuit Court's decision.

## I. PROCEDURAL DEFECTS IN THE BOARD'S DENIAL OF A LICENSE TO OTANI

We hold that the Board's denial of the license Otani applied for was procedurally invalid in three respects.

Most importantly, Otani was never afforded the hearing to which he has a right under the Hawaii Revised Statutes, Chapter 444. HRS § 444-18 provides that in every case where it is proposed to refuse to grant a license to an applicant, the Board shall give notice and hearing; and that whenever possible, the hearing shall be held on the island where the applicant resides.

Two other defects are to be found in the Board's action. First, HRS § 444-16 requires the Board to act on an application for a license within 75 days of receipt of the application. Here, Otani's application was not acted upon for more than eight months. Second, HRS §§ 444-4(2) and 91-4 together provide that the Board's rules and regulations shall have the force and effect of law 10 days after being filed with the lieutenant governor, if they have been approved by the governor and the director of regulatory agencies. Here, the classification scheme was applied to Otani in January, 1968, but it was not approved and signed until almost twelve months later. Moreover, not all of the rules that were applied to him were ever approved at all. None of the rules had any force or effect when they were applied to Otani, and therefore that application of the rules was invalid.

## II. VALIDITY OF THE CLASSIFICATION SCHEME ITSELF

The decision of the Circuit Court seems to invalidate completely the entire classification scheme adopted by the Board. That may have been the correct decision at that time, for the reasons we now mention briefly. However, in light of an additional relevant provision subsequently adopted by the Board, we think that such a wholesale invalidation cannot be upheld.

In HRS § 444-8(a), the Board is broadly empowered to enact classifications "in a manner consistent with estab-

lished usage and procedure as found in the construction business", and in order to protect the public safety, as provided in HRS § 444-4(2). This means that the Board must follow established usage and procedure except where established usage and procedure is in conflict with the public safety; where there is such conflict, public safety overrides usage and procedure.

It was under this broad power that the Board adopted the C-13A classification; and it was apparently because Otani did not meet the requirements for a C-13A license, in the view of the Board, that he was granted only a C-68 license, allowing pole work in new lines only, and prohibiting him from replacing poles.

If this C-13A classification were the only relevant provision governing pole and line work, and if it were read to exclude all persons except those holding a C-13A, the classification scheme would certainly be suspect, since it would prohibit a person in Otani's position from replacing poles in spite of the fact that the established usage and procedure in the business had not been shown to involve any hazards or any danger to the public safety. The record indicates that Otani's business at no time involved him in electrical wiring or hazardous electrical activity of any sort. No danger was shown to exist in his procedures; no accidents were shown to have happened. All of the companies for whom Otani had worked were well satisfied with his performance.

The Board did not claim that Otani was actually doing anything dangerous; instead, it redefined the scope of activities of a pole contractor so as to include stringing of wires and installation of insulators and ground wires, thus adding to the job hazards which had not previously existed. In effect, it then told Otani that the job, as redefined, was now too hazardous and was outside the scope of his licenses. It was therefore the Board's classification

scheme, rather than any dangerous practice of Otani, that injected a hazard into the pole-contracting business. It may be true that defined in this way, the job would be hazardous. But this is not the job that Otani applied to do. His application and his affidavits make it clear that he has not in the past and does not intend in the future to engage in hazardous electrical work as a part of his contracting business.

However, we do not need to reach that point, because of our reading of the Board's present rules and classifications. The C-13A classification still exists, but a subsequent development has made it clear that it is not the Board's policy or intention to prohibit all persons except C-13A contractors from doing pole and line work. On January 27, 1969, more than a year after the denial of Otani's requested license, the Board added a new paragraph to its description of the range of activities of general contractors, and we hereby take judicial notice of that new paragraph which is found in Part 6.1 (a) of the Regulations of the Contractors License Board. It says that a general engineering contractor

> may install poles in all new pole lines and replace poles where circuits of 600 volts or less are involved; providing that framing, installation of the ground wire, insulators and conductors are performed by an electrical contractor holding the C-13 classification.

This seems to be a reasonable rule, since it allows general contractors to do work that is purely structural, yet where electrical hazards are involved, electrical men do the job. Moreover, this is consistent with established usage and procedure in the contracting business, and it is exactly the way in which Otani and those hiring him handled the problem of electrical hazards in the past. The companies either had their own electricians on each job, or else hired qualified electricians to do the electrical part of the work.

Otani is not a general contractor, but two things seem clear from the classifications of the Board relating to general contractors. First, the reason the Board permits general contractors to engage in pole and line work must be that by virtue of being general contractors, they automatically hold specialty licenses in several areas, under Part 6-1(a) of the Board's Regulations. In the four of those areas that are relevant for this type of work, Otani holds licenses also. (These are in specialties C-3, C-8, C-10 and C-17, as discussed above.)

Second, the paragraph added to the regulations in January, 1969, quoted above, makes it clear that persons other than C-13A licensees may do pole and line work, where no voltage over 600 volts is present, as long as electrical men do the electrical work. One with a C-13A can engage in pole and line work and may do the complete job, apparently, from digging holes to stringing wires and insulators. But general contractors, who automatically hold C-3, C-8, C-10 and C-17 licenses, may also do pole setting in both new and replacement situations, as long as no voltage over 600 volts is involved in the circuits. As we noted above, these are the same four licenses that Otani has.

Therefore, we hold that the C-13A is a valid classification, reversing the decision of the Circuit Court. In order to do the complete job, including handling the wires and insulators, one should have such a license. However, we also hold that since Otani's operations are limited to the structural area of the job, if he is willing to forego any jobs where circuits containing over 600 volts are involved, he need only have the four licenses that he already holds.

The Circuit Court also held that Otani would be allowed to do certain work involving underground ducts and conduits. It may be true that the Circuit Court should not have gone beyond the pleadings to reach this issue, but we

need not decide this point, since we take judicial notice of the fact that the C-13B Underground Conduit and Duct classification was never finally approved and is not now part of the Board's rules and classifications.

Affirmed in part and reversed in part.

*James H. S. Choi,* Deputy Attorney General (*Bertram T. Kanbara,* Attorney General with him on the briefs), for appellees-appellants.

*Mamoru Shimokusu* (*Kushi & Kubota* of counsel) for appellants-appellees.