DAVID and GERALDINE AGUIAR, JR., ET AL., Plaintiffs-Appellees, *v.* HAWAII HOUSING AUTHORITY, Defendant-Appellant.

NO. 5422

MAY 28, 1974

RICHARDSON, C.J., LEVINSON, KOBAYASHI, OGATA, JJ., and CIRCUIT JUDGE LANHAM, Assigned by Reason of Vacancy

OPINION OF THE COURT BY LEVINSON, J.

In this appeal we must determine whether the Hawaii Housing Authority (HHA) is required to follow the rule-making procedures of the Hawaii Administrative Procedure Act (HAPA)[1] in adopting regulations which set forth maximum income limits for continued occupancy by tenants in federally-funded public housing administered by the HHA and which establish a schedule for rents which tenants must pay for that housing. In addition, we must decide whether the due process clauses of the federal and state constitutions[2] compel the HHA to afford adjudicatory hearings to tenants in public housing to whom the HHA has sent individualized notices of lease termination and rental increase, and, if hearings are constitutionally mandated, at what point in time they must be held and what procedures are applicable to them.

The plaintiffs are tenants in federally-funded public housing administered by the HHA. Each has signed a standard lease in which he was conveyed a tenancy for a term of approximately one month, automatically renewed for successive terms of one calendar month each. One clause of the lease provides:

The monthly rental of the leased premises may be adjusted from time to time, by raising or lowering the same at the option of the AUTHORITY, according to the established rent schedule, based on changes occurring in the income of the TENANT and his family, or in the composition of the TENANT'S family.

Another clause requires the tenant to submit statements regarding the "income, composition and status" of his fam-

---

[1] HRS ch. 91, *as amended*.

[2] The fourteenth amendment to the United States Constitution provides, in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." Article I, section 4 of the Hawaii Constitution similarly states, in part, "[n]o person shall be deprived of life, liberty or property without due process of law."

ily. It is the policy of the HHA to estimate the tenant's income for the forthcoming year, based on this statement as well as on data assessed by a project administrator at an informal interview with the tenant. If the income estimate exceeds the maximum level allowed by the HHA for continued occupancy in public housing, the tenant is sent a notice which states, in substance, (1) because the tenant is overincome, his lease will be terminated, effective six months from the date of the notice, and (2) for the period between notification of lease termination and actual termination of the tenancy, the monthly rental is increased, effective immediately, from the rental provided in the lease to an amount approximating 20% of the tenant's gross income adjusted for dependents as allowed by the HHA. The tenant has no opportunity for a hearing to contest his alleged overincome status and the consequent rent increase until such time as the HHA commences proceedings to evict him under part I of HRS ch. 360 — ostensibly six months after the date of the foregoing notice.

The plaintiffs were all found by the HHA to be overincome and hence ineligible for continued occupancy in public housing. Each received a notice, as described above; of lease termination and rent increase. In all cases, the amount of rent increase was substantial.[3] The plaintiffs filed this action in 1970 to enjoin the HHA from evicting them or charging them increased rents. They contended that the heart of the HHA's system for determining overincome status and rental amounts — contained in amendments to the HHA's "Master Management Resolution For All Projects Administered by the Hawaii Housing Authority'' — was invalid because not adopted in accordance with the rule-making procedures of the HAPA. In addition, they maintained that the failure of the HHA to afford them adjudicatory hearings prior to the effective dates of rent increases and lease terminations violated their rights to due process of law under the federal and state constitutions.

---

[3] For example, the rental of the plaintiffs Mr. and Mrs. Bitanga was increased from $99.00 to $166.00, that of the plaintiffs Mr. and Mrs. King from $55.00 to $127.00, and that of the plaintiffs Mr. and Mrs. Lung from $86.00 to $133.00. Increases applicable to the other plaintiffs were of similar magnitudes.

Prior to judgment, the HHA on May 24, 1971 adopted its Rule 17, "Rules and Regulations Governing Admission to and Continued Occupancy of Housing Assistance Administration — Aided Units Operated by the Hawaii Housing Authority." This rule, which superseded the HHA's earlier Master Management Resolution, was made and adopted pursuant to the HAPA. Consequently, the plaintiffs did not contest its validity below, nor do they do so here. However, the HHA continued to controvert the plaintiffs' claim of entitlement to adjudicatory hearings prior to the effective date of any *future* rent increases and lease terminations pursuant to Rule 17. Moreover, the plaintiffs' liability to pay past rent increases issued on the authority of the now-superseded amendments to the Master Management Resolution turned on the validity of those amendments even though the plaintiffs' rights to continued occupancy in public housing were governed, beginning May 24, 1971, by the HHA's unchallenged Rule 17.

With the issues thus joined between the parties, the trial court concluded on the basis of a stipulated set of facts that relevant amendments to the HHA's Master Management Resolution were "rules" within the meaning of HRS § 91-1(4). In addition, the trial court held that because the amendments were not adopted in compliance with HRS §§ 91-3 to -4, *as amended*, "[e]ach and every determination by defendant that any plaintiff's income was over the maximum for continued occupancy which was based on the said rules is invalid," and, "[i]n the absence of valid rules, plaintiffs were entitled to pay, and defendant was entitled to receive the rent agreed upon and specified in the leases between plaintiffs and defendant." Finally, the trial court concluded that the plaintiffs are constitutionally entitled to an "administrative hearing prior to the effective date" of future orders of rent increase and lease termination issued pursuant to Rule 17. The trial court filed a judgment accordingly on December 1, 1972, from which the HHA appealed. For the reasons set forth hereinafter, we affirm.

### I. THE VALIDITY OF THE AMENDMENTS TO THE HHA's MASTER MANAGEMENT RESOLUTION

### 1. *Are the Amendments to the Master Management Resolution "Rules"?*

The HHA admits that relevant amendments to the Master Management Resolution were not adopted in accordance with the rule-making requirements of the HAPA.[4] It argues, however, that compliance with those requirements was unnecessary since the amendments were not "rules" within the meaning of HRS § 91-1(4). That section defines the term "rule" as follows:

> "Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

To evaluate properly the HHA's argument, we must inquire into the nature of the HHA's powers and responsibilities under state and federal law and also the purpose and effect of the Master Management Resolution and its amendments.

The HHA is a state agency[5] charged by state law with the responsibility of administering low-income, low-rent public housing projects in Hawaii.[6] In connection with this responsibility, the HHA is required to "establish maximum limits of

---

[4] Once an agency statement is found to be a "rule" within the meaning of HRS § 91-1(4), the agency must, among other requirements, make it available for public inspection, adopt it only after following certain procedures aimed at giving the public notice of the proposed rule and an opportunity to participate in its adoption, submit it for the approval of the governor, and formally file it with the lieutenant governor. These constraints are embodied in HRS §§ 91-2 to -4, *as amended*.

[5] HRS § 356-5 (Supp. 1973) provides, in part:

An authority to be known as the Hawaii housing authority is created. The authority shall be a public body and a body corporate and politic with perpetual existence, and shall consist of six commissioners who shall be appointed by the governor with the consent of the senate.

[6] *See* HRS ch. 356, *as amended*.

annual net income for tenant selection in any public housing project, less an exemption of an amount deemed appropriate by the authority for each minor member of the family other than the head of the family and his spouse, which maximum limits shall be adjusted in accordance with a proper and reliable cost of living index,''[7] and to rent or lease the dwelling accommodations therein only at rentals within the financial reach of persons who lack the amount of income which it determines to be necessary in order to obtain safe, sanitary, and uncongested dwelling accommodations within the area of operation of the authority and to provide an adequate standard of living.''[8] Pursuant to HRS § 356-21,[9] the HHA has contracted with the federal government for the receipt of financial assistance for its projects. By the terms of its contracts with the United States, drafted to reflect the requirements of federal law, the HHA's discretion in promulgating maximum income limits and rental rates is significantly narrower than it might otherwise be under HRS § 356-35. For example, the maximum income limits for occupancy in federally funded projects established by the HHA are subject to the prior approval of the United States Housing Authority,[10] a federal agency within the jurisdiction of the Department of

---

[7] HRS § 356-35(1).

[8] HRS § 356-35(2).

[9] That section reads:
   In addition to the powers conferred upon the Hawaii housing authority by other provisions of this chapter, the authority may borrow money or accept grants from the federal government for or in aid of any housing project which the authority is authorized to undertake, take over any land acquired by the federal government for the construction or operation of a housing project, take over or lease or manage any housing project constructed or owned by the federal government, and to these ends, enter into such contracts, mortgages, leases, or other agreements as the federal government may require including agreements that the federal government shall have the right to supervise and approve the construction, maintenance, and operation of the housing project. It is the purpose and intent of this chapter to authorize the authority to do any and all things necessary to secure the financial aid and the cooperation of the federal government in the undertaking, construction, maintenance, and operation of any housing project which the authority is empowered to undertake.

[10] 42 U.S.C. § 1410(g) (1) (1970).

484

Housing and Urban Development.[11] The United States Housing Authority exercises a similar degree of control over the HHA's rental policies.[12]

The HHA's Master Management Resolution was first adopted on November 13; 1951. As originally promulgated, that document prescribed income limits for continued occupancy in public housing and established a rental scheme under which a uniform rate of 20% was applied to each tenant's gross income, as adjusted by deductions for dependents, as the means of determining that tenant's rent. In 1968, the HHA for the first time departed from the foregoing policy of correlating rent levels to adjusted gross income by a uniform percentage rate. In an amendment to the Master Management Resolution adopted that year, the HHA established a "flat rate" rental scheme, by which qualified public housing tenants paid rent based on the number of rooms they occupied. These rents were, for almost all tenants, substantially below the level of previous rents under the percentage of adjusted gross income system. However, for those tenants whose incomes exceeded the limits for continued occupancy established by the HHA and hence who received notices of lease termination such as those received by the plaintiffs in this case, the HHA maintained its previous policy of assessing rent at a rate of 20% of adjusted gross income for the period between the notices and actual terminations of the tenancies — ostensibly six months.

As stated previously, this basic change in rental policy, in

---

[11] 42 U.S.C. § 1403 (1970).

[12] *See* 42 U.S.C. § 1415(7) (b) (ii) (Supp. 1974), which provides:

The Authority shall not make any contract for loans (other than preliminary loans) or for annual contributions pursuant to this chapter with respect to any low-rent housing project initiated after March 1, 1949 . . . unless the public housing agency has demonstrated to the satisfaction of the Authority that a gap of at least 20 percentum (except in the case of a displaced family or an elderly family) has been left between the upper rental limits for admission to the proposed low-rent housing and the lowest rents at which private enterprise unaided by public subsidy is providing (through new construction and available existing structures) a substantial supply of decent, safe, and sanitary housing toward meeting the need of an adequate volume thereof.

In addition, 42 U.S.C. § 1402(1) (Supp. 1974) precludes the HHA from charging rent in excess of one-quarter of the income of the tenant and his family.

the form of an amendment in 1968 to the Master Management Resolution, was not adopted in compliance with the rule-making procedures of the HAPA, which took effect on January 2, 1962. Furthermore, on at least 9 occasions after the effective date of the HAPA and prior to the adoption of Rule 17, the HHA revised its schedule of annual income limits for continued occupancy, also by amendment to the Master Management Resolution, without complying with the HAPA.

There are several reasons why, according to the HHA, we should hold the foregoing amendments to the Master Management Resolution not to be "rules" within the meaning of HRS § 91-1(4). Each reason focuses on and parses particular words and phrases in that section, the composite of which constitutes the definition of a rule.

First, the HHA argues that the 1968 "flat rate" rental scheme and the various amendments since 1961 establishing maximum income limits for continued occupancy are not "agency statement[s] of general or particular applicability and future effect." The HHA does not seriously contest that regulations purporting to control tenants' future rental obligations and continued eligibility for occupancy are of "future effect." Instead, it suggests that the relevance of these regulations primarily to tenants in public housing belie their "general or particular applicability." The HHA would have us limit this phrase of HRS § 91-1(4) to agency statements touching the affairs of the entire "public," and not just those of a limited class of individuals, such as public housing tenants.

However, even if we ignore the use of the words "or particular" in connection with the applicability of agency statements under HAPA § 1(4),[13] it is clear that agency

---

[13] The HAPA is modelled after the Revised Model State Administrative Procedure Act. Standing Committee Report No. 8, 1961 HAWAII HOUSE JOUR. 655. However, the legislature departed from the form of the Model Act by including within the definition of a rule agency statements of "particular" as well as "general" applicability. Its purpose was to make "the definition more closely comparable to the Federal [Administrative Procedure] Act, [5 U.S.C. § 551(4) (1970)]." *Id.* at 656. Nonetheless, it is usually thought that one key characteristic of rule making as distinguished from adjudication is the former's generality of effect. As Professor Davis notes in connection with the federal APA: "If these words 'or particular' are literally applied, almost every process except licensing becomes rule making . . . . Such an interpretation would rob provisions of the Act relating to 'adjudication' of

statements of "general" applicability include those which delineate the future rights of the entire class of unnamed individuals within the agency's jurisdiction. *See, e.g.*, 1 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 5.02, at 296 (1958); R. Ginnane, *"Rule Making," "Adjudication" and Exemptions Under the Administrative Procedure Act,* 95 U. PA. L. REV. 621, 632 (1947). At least where, as here, the class whose future rights are established by regulations consists of a very large number of individuals — all tenants in public housing administered by the HHA — we hold that the HAPA's requirement of generality of effect is satisfied. *See* 1 F. COOPER, STATE ADMINISTRATIVE LAW 118-19 (1965) [hereinafter cited as COOPER].

Next, the HHA contends that the challenged amendments to the Master Management Resolution do not "implement, interpret, or prescribe law or policy" within the meaning of HRS § 91-1(4). In this connection, the HHA points to the extensive control over its policies which the federal government exercises by virtue of the contracts of assistance between the HHA and the United States Housing Authority. This control, it argues, leaves it virtually no discretion in the area of rental and occupancy decision making. The HHA must demonstrate annually to the federal government that the maximum rents it charges are 20% lower than the lowest rents at which a "substantial supply of decent, safe, and sanitary housing" is available in the private housing market.[14] From the maximum rents determined in this "gap" demonstration, the HHA derives maximum income limits for continued occupancy through the application of a fixed percentage formula.[15] While the HHA thus has no discretion

---

virtually all meaning." 1 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 5.02, at 295 (1958). For this reason, the use of the words "or particular" in the HAPA probably does not significantly change the basic understanding of the distinction between rule making and adjudication held prior to the adoption of the Act. *Id.* § 5.02,.at 296; *see* Note, *The Judicial Role in Defining Procedural Requirements for Agency Rulemaking,* 87 HARV. L. REV. 782, 789 (1974).

[14] 42 U.S.C. § 1415(7) (b) (ii) (Supp. 1974), quoted at note 12 *supra.*

[15] The HHA determines maximum income limits for admission to public housing by computing the income needed to pay the maximum rents determined in the "gap"

to raise or lower maximum income limits once maximum rents are established, and while maximum rents themselves depend in part on a federally imposed formula, the HHA nevertheless retains the important function of assessing the lowest rents at which a "substantial supply of decent, safe and sanitary" private housing is available. Rent levels and income limits directly turn on this assessment. And the plaintiffs — whose rights the assessment obviously affects — sought to participate in it through the procedures of the HAPA.

One stated objective of the rule-making provisions of the HAPA is "[t]o provide for public participation in the rule-making process, by allowing any interested person to petition for a change in the rules as well as to participate in a public hearing."[16] This objective would be disserved if we were to hold that the HHA may ignore the voice of low-income tenants in making annual determinations which so directly touch their statutory right to acquire and remain in decent low-cost housing. Nor are we prepared to hold, as the HHA argues, that any input by tenants into the process of determining rent levels in the private sector would be so lacking in substance as to render adherence to statutory rule-making requirements meaningless. While the process is undoubtedly "technical" in many respects, the HAPA does not require the HHA to conduct a full-blown adjudicatory-type hearing on the level of rents in the private sector, but only to "[a]fford all interested persons opportunity to submit data, views, or arguments, orally *or* in writing." HRS § 91-3(a) (2) (Supp. 1973) (emphasis added). We cannot say that tenants' views on the subject of rents obtainable in the private sector would be of no value to the HHA. *See Thompson v. Washington,* ___ F.2d ___ (D.C. Cir. 1973); *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165, 1169-70 (2d Cir. 1973). In any event, the legislature has already made the judgment through the HAPA that an agency must consider the views of in-

---

demonstration, allowing an allocation of approximately 20% of income for rent. The limits for continued occupancy are 120% of the limits for admission thus computed.

[16] Standing Committee Report No. 8, 1961 HAWAII HOUSE JOUR. 655.

terested persons where it seeks to promulgate a "rule," no matter how complex is the data that goes into the rule's formulation. *Cf. Mortensen v. Board of Trustees*, 52 Haw. 212, 473 P.2d 866 (1970).

We hold that the HHA's annual "gap" demonstration to the federal government and the rents and maximum income limits which it sets, constitute "agency statement[s] . . . that implement . . . law or policy," namely, the mandates of HRS § 356-35. It follows necessarily that the 1968 amendment to the Master Management Resolution establishing a "flat rate" rental system instead of a percentage of adjusted gross income rental system similarly "implemented" the policies of HRS § 356-35 and therefore fell within the purview of this clause of HRS § 91-1(4).

As a final argument to avoid the thrust of the HAPA, the HHA points to an exception to the definition of a "rule" contained in HRS § 91-1(4), namely, that "[t]he term does not include regulations concerning *only* the internal management of an agency *and* not affecting private rights of . . . the public" (emphasis added). The limited scope intended[17] for this exemption from the HAPA's rule-making requirements is evident from the choice of words used to express it.[18] It is "only" those regulations concerning the internal manage-

---

[17] *See* Standing Committee Report No. 8, 1961 HAWAII HOUSE JOUR. 656:

It is intended by this definition of "rule" that regulations and policy prescribed and used by an agency principally directed to its staff and its operations are excluded from the definition. In this connection your Committee considers matters relating to the operation and management of state and county penal, correctional, welfare, educational, public health and mental health institutions, operation of the National Guard, the custodial management of the property of the state or county or of any agency primarily a matter of "internal management" as used in this definition.

[18] The Hawaii exemption from the definition of a rule is to be contrasted with the exemption from rule making for "a matter relating to . . . public property" contained in the federal APA, 5 U.S.C. § 553(a) (2) (1970). That section has been construed to exclude from the rule-making provisions of the federal APA rental decisions by agencies in federally-subsidized housing. Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2d Cir. 1971). It is interesting to note, however, that some federal courts have required these agencies, when making across-the-board rent increases, to follow procedures tantamount to those in the federal APA anyway as a matter of due process of law. *See* Thompson v. Washington,__F.2d__(D.C. Cir. 1973); Burr v. New Rochelle Municipal Housing Authority, 479 F.2d 1165 (2d Cir. 1973). *But see* McKinney v. Washington, 442 F.2d 726 (D.C. Cir. 1970).

ment of an agency "and" not affecting private rights of the public that may be adopted without an opportunity for public participation. One commentator has observed that even in those states where the statutory exemption is broader, convering "all statements concerning matters of internal management, . . . reliance must be placed on the courts to foreclose any tendencies that agencies might exhibit to avoid the rule-making requirements by casting regulations in terms of internal management." 1 COOPER 116.

The HHA's 1968 amendment to its Master Management Resolution altered fundamentally the rental structure in public housing — its immediate result was to change the amount of rent paid by nearly every public housing tenant. Similarly, the amendments setting maximum income limits for continued occupancy, based on the HHA's "gap" demonstrations to the federal government, determined every tenant's eligibility to remain in public housing. Plainly, therefore, these amendments "affected" in both a practical and a legal sense the "private rights" not only of those tenants actually living in public housing but also those members of the public at large who were interested in becoming tenants. Given this effect, the degree to which those measures concerned "only" the "internal Management" of the HHA becomes irrelevant in view of the use of the conjunctive "and" in the statutory articulation of this exemption from the definition of a rule. This unambiguous statutory language, moreover, compels us to a result to which we would have been drawn in any event even if Hawaii had adopted a more expansive exemption from the definition of a rule. *See* 1 COOPER 116. As we stated in *In re Terminal Transportation, Inc.*, 54 Haw. 134, 138, 504 P.2d 1214, 1216 (1972), within the context of construing the adjudicatory provisions of the HAPA:

"[T]his court, in the absence of clear legislative direction to the contrary, will not interpret provisions of the Hawaii Administrative Procedure Act so as to give government even 'an appearance of being arbitrary or capricious,' " *citing In re Western Motor Tariff Bureau, Inc.*, 53 Haw. 14, 19, 486 P.2d 413, 416 (1971).

The foregoing observation has equal relevance to the

rule-making provisions of the HAPA. By providing a structure for public input into agency decision making, the HAPA facilitates agency awareness of views and data which make it at once better informed and more responsive to public needs. In the context of rental and occupancy decisions, application of the HAPA also avoids the thrust of the plaintiffs' very substantial claim to a constitutional right of participation. *See Thompson v. Washington, supra*.

We therefore hold that the HHA's amendments to its Master Management Resolution governing the scheme under which the plaintiffs paid rent and their right to continued occupancy in public housing were "rules" within the meaning of HRS § 91-1(4). We next discuss the effect of the HHA's failure to comply with the HAPA in adopting these rules.

### 2. *The Effect on the Plaintiffs of the HHA's Non-compliance with the HAPA*

The HHA makes three arguments to support its contention that our characterization of the amendments to its Master Management Resolution as "rules" should not affect the substantive rights of the plaintiffs in this case. It suggests first that each of the plaintiffs had "actual knowledge" of the rules and therefore that the rules should be held effective as to them, citing HRS § 91-2(b).[19] Second, it contends that even if we were to hold its rules ineffective for any purpose, the plaintiffs' rental obligations would not be affected since the rents they were required to pay under the notices of rent increase and lease termination were the same as those required by the original Master Management Resolution, validly adopted prior to the effective date of the HAPA. Finally, it argues that the plaintiffs' rental obligations are controlled absolutely by their leases, which uniformly allow increases based on the HHA's "established rent schedule."

The HHA's first argument misconceives the purposes

---

[19] That section reads:

No agency rule, order, or opinion shall be valid or effective against any person or party, nor may it be invoked by the agency for any purpose, until it has been published or made available for public inspection as herein required, except where a person has actual knowledge thereof.

behind the rule-making provisions of the HAPA. HRS §
91-7(b) states that a reviewing court "shall declare the rule
invalid if it finds that it . . . was adopted without compliance
with statutory rule-making procedures." This sanction is
independent of the sanction contained in HRS § 91-2(b),
which is addressed exclusively to an agency's duty to make
its duly adopted rules available for public inspection. *See* 1
COOPER 189, 207. Indeed, we held in *Otani v. Contractors
License Board*, 51 Haw. 673, 676, 466 P.2d 1009, 1011 (1970)
that rules which are not approved by the governor and filed
with the lieutenant governor as required by HAPA §§ 3(b) &
4(b) (2), by the fact of that failure alone have no "force or
effect." *See also State v. Lee*, 51 Haw. 516, 522, 465 P.2d 573,
577 (1970). Not only were the rules in this case neither ap-
proved by the governor nor filed with the lieutenant governor,
but they suffered the more fundamental defect of having been
adopted in the absence of compliance with HRS § 91-3(a)(1)
(Supp. 1973). That section constitutes an "explicit . . . invi-
tation to the public to participate in the formulation of . . .
rule[s]," 1 COOPER 189. By refusing to extend that invitation
as it was thus required to do, the HHA subverted the integrity
of the rules themselves; it is obvious that this defect, which
goes to the very substance of the rules, could not be cured
merely by the plaintiffs, "actual knowledge," if any, that
those rules existed.[20]

The HHA's second argument with respect to the effect of
its non-compliance with the HAPA is more substantial than
its first. As noted already, the HHA's Master Management
Resolution was originally adopted in 1951. Under that docu-
ment, tenants were obligated to pay rent computed at a rate of
20% of their adjusted gross income. This system for deter-
mining rents continued in force until 1968, when the HHA
adopted its "flat rate" system by the terms of which only
those tenants who were allegedly "overincome" were obli-
gated to pay 20% of their adjusted gross income in rent. If the

---

[20] Given our view that any "actual knowledge" of the rules' existence that the
plaintiffs might have had does not affect the validity of those rules under HRS §§ 91-3
to -4, *as amended*, we do not reach the merits of the trial court's express finding that
they lacked any such knowledge.

new system was "invalid" because not adopted pursuant to the HAPA, the HHA argues, then the plaintiffs' rentals were governed by the old system, for it was adopted prior to the effective date of the HAPA and therefore continued "in full force and effect" after that date. L. 1961 ch. 103, § 17(c). Since rentals under the old system would have been the same as rentals purportedly charged the plaintiffs under the new system, the HHA urges, the plaintiffs' rights are not affected by our holding that the new system was invalid.

The answer to the HHA's argument turns on the effect, if any, we should give to the maximum income limits we have already held that the HHA invalidly adopted. The plaintiffs were treated differently from all other public housing tenants only because their estimated incomes allegedly exceeded those limits. In substance, the HHA "waived" for some tenants but not for others strict application of the 20% of adjusted gross income system it now asserts to be authoritative. The sole basis for determining this waiver, moreover, was whether a tenant's estimated income exceeded limits which were adopted without affording tenants and the public an opportunity to participate as required by the HAPA. Since the salient criterion was itself invalid, therefore, we hold that the HHA may not now use it as a basis for differentiating the plaintiffs from all other public housing tenants, whose rents were, according to the logic of the HHA, lower than required by "valid" HHA rules.[21] *See* Note, *Violations by Agencies of Their Own Regulations*, 87 HARV. L. REV. 629, 637-39 (1974); *cf*. L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 586-89 (1965).

The HHA's final argument refers to one clause of the

---

[21] Since, as we hold *infra*, the HHA may not assert rent increases without affording the plaintiffs a prior adjudicatory hearing under the HAPA, we would be required by HRS § 91-14(g) (6) (Supp. 1973) eventually to strike down any differentiation of the plaintiffs from other tenants based on invalid income limits. That section requires judicial reversal of an agency decision in a contested case if it is "[a]rbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Requiring the plaintiffs to pay greater rents than other public housing tenants would fall within the proscriptions of that section if predicated on invalid rules and hence on grounds which are by definition inadequate and arbitrary. L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 586-89 (1965).

standard lease which each of the plaintiffs signed, allowing rent increases based on the HHA's "established rent schedule." However, that lease provision alone does not accord the HHA a *carte blanche* by which it may sidestep the independent requirements of the HAPA. *Cf. Escalera v. New York City Housing Authority*, 425 F.2d 853, 864 (2d Cir.), *cert. denied*, 400 U.S. 853 (1970). Construing the clause in connection with the HHA's rule-making obligations, we hold that the "established rent schedule" must be *validly* established under relevant statutory and constitutional provisions to authorize the HHA to increase rents. Moreover, we hold that any application of an otherwise valid rent schedule to increase rents under the leases must be even-handed and must rest on statutorily acceptable criteria. We therefore agree with the trial court that in the absence of valid or validly enforced rules to the contrary, the plaintiffs' rental obligations were controlled by the specific amounts contained in their leases.

## II. THE RIGHT TO A HEARING PRIOR TO THE IMPOSITION OF ORDERS OF LEASE TERMINATION AND RENT INCREASE

In addition to declaring invalid the amendments to the HHA's Master Management Resolution adopted since the effective date of the HAPA, the trial court enjoined the HHA "from charging or collecting or attempting to charge or collect more than the fixed rent amount specified in [HHA Rule 17, validly adopted under the HAPA,] and from issuing orders of rent increase or lease termination based on any overincome determination until such time as [the HHA] adopts rules providing for an administrative evidentiary hearing on the validity and effect of any such overincome determination, and until [the HHA] offers plaintiffs such an administrative hearing." The HHA challenges the premise of this injunction — the trial court's conclusion that the due process clauses of the federal and state constitutions require an opportunity for an adjudicatory hearing on the alleged overincome status of public housing tenants before the HHA can take any action adverse to the tenants based on that status. The plaintiffs on the other hand, assert that their interests in continued occu-

pancy in public housing and against the erroneous imposition of rent increases are sufficiently weighty to require pre-imposition adjudicatory hearings as a matter of due process of law.

The HHA's present practice under Rule 17 is identical with its practice under the now-superseded amendments to the Master Management Resolution, discussed in the first portion of this opinion. If the HHA determines a tenant to be overincome based on data submitted annually by the tenant and on an interview with the tenant conducted by a project administrator, the tenant is notified that his lease will be terminated, effective six months hence, and that his rent is increased in the interim to 20% of his adjusted gross income, effective immediately. The HHA points out that no tenant can actually be *evicted* from public housing without the notice and prior hearing specifically provided in part I of HRS ch. 360.[22] The plaintiffs do not contest the adequacy of this procedure for its purpose. *Compare Caulder v. Durham Housing Authority,* 433 F.2d 998 (4th Cir. 1970), *cert. denied,* 401 U.S. 1003

---

[22] HRS § 360-1 authorizes the HHA to terminate a tenant's lease and evict him on several grounds, including "violation of any of the rules and regulations of the authority" and "violation of any of the provisions of a lease." However, a tenant may not actually be evicted without a hearing as provided in HRS § 360-2 (Supp. 1973). That section reads:

In every case where it is proposed to evict a tenant, licensee, or other occupant under section 360-1, written notice shall be given to the person concerned specifying the cause or causes for which it is proposed to evict him and fixing the date and place of hearing. The notice shall be given at least five days before the date set for the hearing. At the hearing, before final action is taken the person concerned shall be entitled to be heard in person or through counsel, and shall be accorded a full and fair hearing.

Hearings shall be conducted by a trial examiner or board appointed for the purpose by the Hawaii housing authority. Trial examiners or members of any board may be commissioners or employees of the authority. The decision and order of eviction of the trial examiner or board shall be final unless an appeal is taken as hereinafter provided.

In all such hearings, the trial examiner or board shall have the same powers respecting administering oaths, compelling the attendance of witnesses and the production of documentary evidence, and examining witnesses, as are possessed by circuit courts. In case of disobedience by any person of any order of the trial examiner or board, or of any subpoena issued by him, or it, or the refusal of any witness to testify to any matter regarding which he may lawfully be questioned, any circuit judge, on application by the trial examiner or board, shall compel obedience as in the case of disobedience of the requirements of a subpoena issued by a circuit court, or a refusal to testify therein.

(1971) *with Johnson v. Tamsberg*, 430 F.2d 1125 (4th Cir. 1970). But they rejoin that a pre-eviction hearing at which a tenant may present evidence that he is not overincome does not remedy the impact of any rent increase imposed without a hearing when the tenant received his original notice of lease termination and rent increase six months previously.

The issue is thus a narrow one: does due process of law require an adjudicatory-type hearing prior to the imposition of individualized rent increases on public housing tenants?[23] With the focus of our inquiry thus narrowed, we proceed to the merits of the plaintiffs' constitutional claim.

In general a claim of a due process right to a hearing requires a two-step analysis: (1) is the particular interest which the claimant seeks to protect by a hearing "property" within the meaning of the due process clauses of the federal and state constitutions, and (2) if the interest is "property," what specific procedures are required to protect it. In *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 497 P.2d 564 (1972), for example, we held that a medical doctor's interest in his continued practice of medicine in a federally-funded private hospital rose to the level of a constitutionally-protected property interest. We then proceeded to flesh out the details of the hearing that due process required the hospital to afford the doctor prior to denying him surgical privileges. The resulting procedure reflected a balance between the doctor's substantial interest in continuing his profession on the one hand and the hospital's substantial interest in efficient administration on the other.

In this case our task is significantly less complex. We need only decide whether the plaintiffs' interest in continuing to receive the benefit of low cost housing and hence is not paying assertedly erroneous rent increases is substantial enough to require agency hearings prior to the imposition of the increases. Since rent increases of the type involved in this

---

[23] Of course, requiring a hearing prior to a rent increase based on a tenant's alleged overincome status would obviate the need for a later pre-eviction hearing on the same issue. To that extent, therefore, a hearing on whether a rent increase is warranted would also constitute a hearing on whether the tenant may properly be evicted on the ground that his income exceeds maximum limits for continued occupancy.

case turn on an individualized assessment of the plaintiffs' income status, such a holding would automatically invoke the adjudicatory procedures of the HAPA[24] as the measure of the hearings to which the plaintiffs are entitled, for an agency is required to follow those procedures in all "contested cases." HRS § 91-1(5) defines a contested case as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." Since rights, duties, or privileges "required by law" to be determined after a hearing include those required by constitutional right to be so determined, 1 COOPER 120-21; cf. *Wong Yang Sung v. McGrath,* 339 U.S. 33 (1950), a holding to this effect favorable to the plaintiffs would necessarily implicate the specific adjudicatory provision of the HAPA as the measure of their procedural rights.

In our view the plaintiffs' interest in continuing to receive the statutory benefit of low-cost housing — and hence in resisting erroneous rent increases — is a "property" interest for due process purposes. This conclusion follows inexorably from a solid line of recent cases rejecting the traditional "right-privilege" distinction in this area of the law and holding that a benefit which one is entitled to receive by statute constitutes a constitutionally-protected property interest. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *Escalera v. New York City Housing Authority, supra* at 861 (tenancy in public housing); *Mortensen v. Board of Trustees,* 52 Haw. 212, 473 P.2d 866 (1970) (disability retirement benefits). In economic terms the government benefit here — low-rent public housing — "differs in technique but not in ultimate objective from the benefit at issue in *Goldberg v. Kelly,* an income supplement to needy families." *Thompson v. Washington, supra* at___. The extent of deprivation occasioned by a rent increase in public housing, moreover, can be substantial. *See* note 3 *supra.* As Judge Leventhal noted in his opinion for the court in *Thompson:*

> The injury alleged by plaintiff-tenants in this case presents a substantial deprivation — the inability to pay the

---

[24] *See* HRS §§ 91-9 to -14, *as amended.*

increased rentals or to find satisfactory substitute housing. While the tenants may be able to bear the burden of higher rentals by foregoing other purchases, the plaintiffs allege that this would cause them to forego necessities, reducing their welfare below a tolerable minimum. This, they argue, is exactly the situation Congress intended to alleviate by establishing a housing program for low-income families.

*Id.* at___; *see* Note, *Procedural Due Process in Government-Subsidized Housing*, 86 HARV. L. REV. 880, 896 (1973).

In view of the substantial nature of the plaintiffs' interest, we cannot entertain seriously the HHA's argument that a pre-imposition hearing should be excused because deferring rent increases until after tenants have been afforded an opportunity to be heard may disable the HHA from ever collecting lawfully-due increases. Recent decisions have clearly established that there is a presumption in favor of *pre*-deprivation hearings which can be overcome only by a showing that the government has a manifest need to act promptly and without delay. *E.g. Fuentes v. Shevin*, 407 U.S. 67, 82 (1972); *Bell v. Burson*, 402 U.S. 535, 542 (1971). Professor Freedman has correctly noted that "[t]he government's interest in protecting its purse, although a legitimate one, is hardly comparable to those that the Court has found adequate to sustain summary action in the true emergency cases." J. Freedman, *Summary Action by Administrative Agencies*, 40 U. CHI. L. REV. 1, 21-22 (1972). The continuing low-rent quality of HHA-administered public housing is a variety of welfare subsidy the termination or reduction of which may jeopardize the economic survival of its recipients. Given the magnitude of the recipients' interest, therefore, we hold the HHA's argument to dispense with procedural safeguards based solely on the risk of non-collection of lawfully due increases clearly insufficient. *See Goldberg v. Kelly, supra* at 265-66.

Nor can we accept the HHA's final argument that the plaintiffs have waived whatever due process protection to which they are entitled by signing the HHA standard leases. One clause of that document states that rent increases im-

posed by the HHA "shall immediately take effect and apply to and be paid by the TENANT.'' As Professor Schoshinski has stated, however, "[t]he public housing lease is the epitome of a contract of adhesion. . . . An applicant for public housing has no choice but to adhere to the dictated terms; if he objects he remains in, or is relegated to, private slum housing.'' R. Schoshinski, *Public Landlords and Tenants: A Survey of the Developing Law,* 1969 DUKE L. J. 399, 468 (1969); *see* T. Indritz, *The Tenants' Rights Movement,* 1 NEW MEX. L. REV. 1, 111-12 (1971). Given the gross disparity in bargaining power between prospective tenants and the HHA, as well as the magnitude of the tenants' interest in receiving the uninterrupted benefit of low-income housing unless adjudicated to be unentitled to it, we conclude that in signing the HHA standard leases the plaintiffs did not knowingly and effectively waive their constitutional right to a hearing prior to the imposition of any rent increase based on alleged overincome status. We agree with Professor Schoshinski that

> [w]aivers should not be accorded the traditional judicial sanction when they appear in public housing agreements because they are not the result of a freely negotiated, arm's-length bargain between two private parties of relatively equal contractual power. The extortion of basic legal rights by a federally-funded, state-created, and locally administered public housing authority raises serious constitutional questions.

Schoshinski, *supra* at 470. *Cf. Escalera v. New York City Housing Authority, supra* at 864. ("The . . . argument that the 'additional rent' charges are provided for in the [public housing] lease is not dispositive of the question of the fairness of the procedures under which said charges are imposed'").

As we have held, the plaintiffs' "legal rights, duties, or privileges'' with respect to their continued receipt of the benefit of low-rent housing are "required by law to be determined after an opportunity for agency hearing,'' HRS § 91-1(5). This being so, the HHA must follow the adjudicatory procedures of the HAPA prior to increasing rents because of any plaintiff's alleged overincome status. Those procedures embody the specific elements of notice and an opportunity to

be heard which lie at the heart of all due process guarantees. *See Mortensen v. Board of Trustees, supra* at 221, 473 P.2d at 872. Any administrative burden they impose on the HHA is more than offset by the substantial safeguards they afford to low-income tenants against erroneous rent increases which may undermine those tenants' very ability to survive.

Affirmed.

*E. John McConnell, Jr.,* and *M. Gay Conklin,* Deputy Attorneys General *(George Pai,* Attorney General, of counsel) for defendant-appellant.

*Durell Douthit* and *Joel E. August,* Associate Counsel, Legal Aid Society of Hawaii, for plaintiffs-appellees.