175 P.3d 126 (2007)
Melvin T. TANAKA, James Watt, Masaichi Takaki, and Dexter Egdamin, Plaintiffs-Appellants,
v.
STATE of Hawai`i, DEPARTMENT OF LAND AND NATURAL RESOURCES ("DLNR"); Roes Governmental Units or Entities 1-10, Defendants-Appellees (Civ. No. 04-1-0357).
Katsuya Yamada, Plaintiff-Appellant,
v.
Department of Land and Natural Resources ("DLNR"), State of Hawai`i; State of Hawai`i, Defendants-Appellees (Civ. No. 04-1-0358).
No. 27487.
Intermediate Court of Appeals of Hawai`i.
December 31, 2007.
*127 Gerard D. Lee Loy, for plaintiffs-appellants, Melvin T. Tanaka, James Watt, Masaichi Takaki, and Dexter Egdamin.
Katsuya Yamada, plaintiff-appellant, pro se.
William J. Wynhoff, deputy attorney general, State of Hawai`i, for defendants-appellees, Department of Land and Natural Resources, State of Hawai`i; and State of Hawai`i.
WATANABE, Presiding J., FOLEY, and NAKAMURA, JJ.
Opinion of the Court by WATANABE, Presiding J.
This appeal stems from two consolidated cases for declaratory and injunctive relief, challenging the following actions by Defendants-Appellees State of Hawai`i (the State) and Department of Land and Natural Resources, State of Hawai`i (DLNR or the department) (collectively, State Defendants) as being in violation of Hawaii Revised Statutes (HRS) chapter 91 (1993 & Supp.2006), the Hawaii Administrative Procedure Act (HAPA): (1) allowing game-bird hunting in the County of Hawai`i on Wednesdays and Thursdays, (2) requiring hunters to purchase *128 a wildlife-conservation stamp and a bird-hunting stamp before they can obtain a license to hunt for birds, and (3) allowing black-powder hunting in areas restricted to archery hunting by DLNR rules. Plaintiffs-Appellants Melvin T. Tanaka, James Watt, Masaichi Takaki, and Dexter Egdamin (collectively, Tanaka Plaintiffs) filed Civil No. 04-1-357, alleging claims 1 and 2, and Plaintiff-Appellant Katsuya Yamada (Yamada) filed Civil No. 04-1-358, alleging all three claims. In this opinion, Tanaka Plaintiffs and Yamada will be collectively referred to as Appellants.
The Circuit Court of the Third Circuit (the circuit court)[1] entered judgment in favor of State Defendants and against Appellants as to claims 1 and 2, and in favor of Yamada and against State Defendants as to claim 3. Appellants timely appealed from the adverse judgment as to claims 1 and 2. State Defendants did not appeal from the judgment as to claim 3.
We conclude that DLNR exceeded its authority when it allowed game-bird hunting on Wednesdays and Thursdays and exacted fees for the wildlife-conservation and bird-hunting stamps (the stamp fees) without going through the rulemaking procedures set forth in HRS chapter 91. Accordingly, we reverse the circuit court's judgment as to claims 1 and 2.

BACKGROUND
Appellants are avid game-bird hunters and reside on the island of Hawai`i. DLNR is the state agency responsible for managing and administering "wildlife, . . . game management areas, [and] public hunting areas," HRS § 171-3 (Supp.2006); regulating hunting activities on state lands, HRS chapter 183D (1993 & Supp.2006); and enforcing state hunting laws. Id. DLNR is "headed by an executive board . . . known as the board of land and natural resources" (the Board), HRS § 171-3, which is "composed of seven members, one from each land district[[2]] and three at large, to be nominated and, by and with the advice and consent of the senate, appointed by the governor[.]" HRS § 171-4(a) (Supp.2006) (footnote added).
Pursuant to HRS § 183D-2(12) (1993 & Supp.2006), DLNR is charged with the duty to "[p]reserve, protect, and promote public hunting." HRS § 183D-4(a) (Supp.2006) provides that "[f]or the purposes of preserving, protecting, conserving, and propagating wildlife, [DLNR] shall establish, maintain, manage, and operate game management areas, wildlife sanctuaries, and public hunting areas on land under its control[.]" In addition, HRS § 183D-3 (1993) provides:
Rules. Subject to chapter 91, the department shall adopt, amend, and repeal rules:
(1) Concerning the preservation, protection, regulation, extension, and utilization of, and conditions for entry into wildlife sanctuaries, game management areas, and public hunting areas designated by the department;
(2) Protecting, conserving, monitoring, propagating, and harvesting wildlife;
(3) Concerning size limits, bag limits, open and closed seasons, and specifications of hunting gear which may be used or possessed; and
(4) Setting fees for activities permitted under this chapter, unless otherwise provided for by law.
The rules may vary from county to county or in any part of the county and may specify certain days of the week or certain hours of the day in designating open seasons, except that any fees established by rule shall be the same for each county. All rules shall have the force and effect of law.
(Emphasis added.)
As authorized by HRS § 183D-3, DLNR promulgated administrative rules that regulate game-bird hunting. See Hawaii Administrative Rules (HAR) title 13, chapter 122 (1999). Pursuant to HAR § 13-122-4 (1999),[3] which references and incorporates an *129 Exhibit 1,[4] DLNR: (a) established "Saturdays, Sundays, and State Holidays" as "Open Hunting Days" for game birds on the island of Hawai'i; and (b) provided that "[t]he [B]oard or its authorized representative may . . . lengthen hunting seasons; and open special hunting . . . seasons; whenever, after study by the division, the action is deemed to be in the public interest."
On October 17, 2004, without revising any of its rules, DLNR published a notice in the Hawaii Tribune Herald announcing "the opening of the 2004-2005 Game Bird Hunting Season on Saturday, November 6, 2004." The notice stated, in part:
Due to significant rainfall received throughout the game bird breeding season this year, department biologists are predicting good results around the state. The fall season will run through Monday, January 17, 2005, (Martin Luther King Day) with legal hunting days on Saturday, Sunday, and state holidays with exceptions as noted below. Mauna Kea Game Management Area and privately owned lands on the Island of Hawaii will be open to hunters on two weekdays, Wednesdays and Thursdays, this season due to good game bird resources. . . .
ISLAND OF HAWAII
. . . .
PORTIONS OF THE POHAKULOA TRAINING AREA (PTA) will be made available to hunting when not in conflict with military training activities. . . . When allowed, hunting days will be on Wednesdays, Thursdays, weekends, and state holidays. . . .
KAOHE & MAUNA KEA GAME MANAGEMENT AREA will be open for game bird hunting on Wednesdays, Thursdays, weekends and state holidays throughout the game bird hunting season. Wild turkeys can only be hunted during the month of November. . . .
. . . .
PRIVATELY OWNED LANDS on the island of Hawaii may be open to game bird hunting on Wednesdays, Thursdays, weekends, and state holidays, at the landowner's discretion.
Pursuant to HRS § 183D-21 (Supp.2006),[5] all hunters in Hawai`i are required to obtain a hunting license, which, pursuant to HRS § 183D-23 (1993), "shall expire on June 30 next following the date of issuance." Hunters must also pay a hunting-license fee "or any other hunting related fee the [B]oard may require as provided in [HRS chapter 183D]." HRS § 183D-22 (1993 & Supp. 2006).[6]
*130 HRS § 183D-10.5(a) (1993) establishes a wildlife revolving fund administered by DLNR. HRS § 183D-10.5(b) (1993) states, in relevant part, as follows:
Wildlife revolving fund; establishment. . . .
(b) The following proceeds shall be retained by or transmitted to [DLNR] for deposit into the wildlife revolving fund:
(1) Moneys collected as fees for hunting licenses[;]
. . . .
(4) Moneys collected from the sale of:
(A) Any article, in addition to a hunting license, which a person is required to purchase from the department in order to hunt, when the requirement is established by law or rule[.]
DLNR also adopted HAR § 13-122-5.1 (1999), which provides, in relevant part:

Applications, tags, and stamps. (a) [DLNR] shall have the authority to require application forms for the selection of hunters and may require the use of tags or stamps or both, for purposes of hunting game birds. [DLNR] may establish fees for wildlife stamps, application fees, and tags for special or lottery hunts;. . . . Fees set for each of the following: application fees, tags, and stamps shall not exceed the cost of a hunting license, with the exception that the [B]oard reserves the right to establish higher application fees for specific hunts that require special accommodations, including, but not limited to, helicopter transportation costs.
(Emphases added.)
DLNR has relied on HAR § 13-122-5.1 to require hunters to purchase a wildlife-conservation stamp to "validate" a hunting license. For fiscal year 2002 (July 1, 2001 to June 30, 2002), the Board set the fee for this stamp at $5 per hunting season and, in 2002, increased the fee to $10. In 2004, the Board began requiring game-bird hunters to purchase a second stamp, to be affixed to their hunting license. The Board set the fee for this bird-hunting stamp at $10 per hunting season. DLNR did not amend its rules pursuant to HRS chapter 91 before requiring purchase of and establishing fees for these stamps.
On November 3, 2004, Tanaka Plaintiffs filed their lawsuit, seeking: injunctive and declarative relief to prohibit the hunting of game birds on any weekday except a holiday; and special damages in amounts to be proven at trial. Tanaka Plaintiffs alleged that: (1) "DLNR's decision to allow Game Bird Hunting on Wednesdays and Thursdays is contrary to [HAR] Chapter 122 without following the requirements of [HRS] Chapter 91[;]" and (2) DLNR's requirement that hunters annually purchase a stamp in order to obtain a hunting license "is a violation of HRS chapter 183D, as amended[,]" "amount[s] to a tax without proper authorization by statute[,]" is "in violation of . . . [HRS § ]91-3, . . . as amended," and "violates the United States Constitution 14th Amendment requirement of due process of law."
In his complaint, Yamada alleged that DLNR was systematically violating various laws and its own rules by: (1) allowing game-bird hunting on Wednesdays and Thursdays,[7] *131 (2) requiring hunters to purchase the wild-life-conservation and bird-hunting stamps in addition to a hunting license in order to engage in bird hunting, and (3) administratively permitting black-powder hunting in areas designated by rule as archery-hunting areas (black-powder count).
On April 1, 2005, Yamada filed a motion for summary judgment. That same day, the State filed its Motion for Summary Judgment as to All Claims in Both Cases. On April 4, 2005, Tanaka Plaintiffs filed their Motions for Summary and Declaratory Judgments. After hearing these motions on April 29, 2005, the circuit court entered an order on August 9, 2005, granting in part and denying in part the State's motion for summary judgment (the summary-judgment order). The circuit court held, in pertinent part:
As to the hunting season and weekday hunting . . ., the court finds and concludes that [the Board] is authorized to control hunting days by [HRS] § 183D-2 (1993 and Cum.Supp.2004), [HRS] § 183D-3 (1993), and [HRS] § 183D-31 et. [sic] seq.; that HAR § 13-122-4, a validly adopted rule, implements the authority; and that pursuant to statute and rule the chairperson, as the authorized representative of the [B]oard, added the disputed weekdays to the hunting season.
As to wildlife stamps . . ., the court finds and concludes that the [B]oard is authorized to require payment for wildlife stamps as a condition of obtaining a hunting license by [HRS] § 183D-22(a) (Cum.Supp. 2004) and [HRS] § 183D-10.5 (1993); that HAR § 13-122-5.1, a validly adopted rule, implements the authority; and that pursuant to statute and rule [DLNR], through the [B]oard, properly approved the disputed charge.
As to black powder hunting in areas allegedly designated as archery hunting areas . . ., the State has failed to show that the [B]oard or its authorized representative approved such hunting.
[Yamada] has failed to show that [DLNR] has been systematically violating laws of the State of Hawaii and [DLNR's] own rules and regulations.
On May 17, 2005, State Defendants filed a motion for reconsideration of that part of the circuit court's August 9, 2005 summary-judgment order that resolved the black-powder count of Yamada's complaint in Yamada's favor. On August 30, 2005, the circuit court entered its "Findings of Fact, Conclusions of Law and Order Denying [State Defendants'] Motion for Partial Reconsideration of Ruling on Motions for Summary Judgment Filed April 1, 2005[.]" On the same day, the circuit court entered final judgment in favor of State Defendants as to all claims asserted by Tanaka Plaintiffs and all claims asserted by Yamada, except the black-powder count. On September 6, 2005, Appellants timely filed their notice of appeal. The State did not cross-appeal.

DISCUSSION
A. The HAPA Rulemaking Requirements
HRS chapter 91 includes various provisions that relate to the adoption, amendment, or repeal of rules. Relevant to this appeal, HRS § 91-3 (Supp.2006) currently provides as it did during the proceedings below, in pertinent part, as follows:
Procedure for adoption, amendment, or repeal of rules. (a) Except as provided in subsection (f), prior to the adoption of any rule authorized by law, or the amendment or repeal thereof, the adopting agency shall:
(1) Give at least thirty days' notice for a public hearing. The notice shall include:
(A) A statement of the topic of the proposed rule adoption, amendment, or repeal or a general description of the subjects involved; and

*132 (B) A statement that a copy of the proposed rule to be adopted, the proposed rule amendment, or the rule proposed to be repealed will be mailed to any interested person who requests a copy, pays the required fees for the copy and the postage, if any, together with a description of where and how the requests may be made;
(C) A statement of when, where, and during what times the proposed rule to be adopted, the proposed rule amendment, or the rule proposed to be repealed may be reviewed in person; and
(D) The date, time, and place where the public hearing will be held and where interested persons may be heard on the proposed rule adoption, amendment, or repeal.
The notice shall be mailed to all persons who have made a timely written request of the agency for advance notice of its rulemaking proceedings, given at least once statewide for state agencies and in the county for county agencies. Proposed state agency rules shall also be posted on the Internet as provided in section 91-2.6; and
(2) Afford all interested persons opportunity to submit data, views, or arguments, orally or in writing. The agency shall fully consider all written and oral submissions respecting the proposed rule. The agency may make its decision at the public hearing or announce then the date when it intends to make its decision. Upon adoption, amendment, or repeal of a rule, the agency, if requested to do so by an interested person, shall issue a concise statement of the principal reasons for and against its determination.
(Emphases added.)
HRS § 91-1 (1993) defines "[r]ule" as
each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.
DLNR complied with the HAPA rulemaking requirements when it initially designated Saturdays, Sundays, and state holidays as days for game-bird hunting on the island of Hawai`i. The issue in this appeal is whether DLNR was required to comply with the rulemaking requirements when it added two hunting days to each week of the 2004-2005 hunting season and required hunters to pay two stamp fees in order to hunt.
B. The Validity of DLNR's Addition of Two Extra Days Per Week for Game-Bird Hunting

1.
The Hawai`i Supreme Court has stated that
[t]he interpretation of a statute is a question of law reviewable de novo.
When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
Ka Pa`akai O Ka `Aina v. Land Use Comm'n, 94 Hawai`i 31, 41, 7 P.3d 1068, 1078 (2000) (citations and internal quotation marks omitted) (quoting Amantiad v. Odum, 90 Hawai`i 152, 160, 977 P.2d 160, 168-69 (1999)). In addition,
[t]he general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.
*133 Allstate Ins. Co. v. Ponce, 105 Hawai`i 445, 454, 99 P.3d 96, 105 (2004) (quoting In re Doe Children, 105 Hawai`i 38, 53, 93 P.3d 1145, 1160 (2004)).
DLNR's current rule, HAR § 13-122-4(a) (1999), states, in pertinent part, that "[b]ag limits, open seasons, hunting days, and game birds that may be hunted are listed in Exhibits 1, 3, 5, 7, 9, and 11, located at the end of this chapter and by reference made a part hereof." (Emphases added.) Exhibit 1 lists the permissible days for game-bird hunting as "Saturdays, Sundays, and State Holidays." Since HAR § 13-122-4(a) specifically incorporates Exhibit 1 by reference, the hunting days listed in Exhibit 1 are a part of the rule.
HRS § 183D-3 explicitly and unambiguously requires DLNR to amend its rules affecting public-hunting areas in accordance with HRS chapter 91. HRS § 183D-3 states, in pertinent part:
Rules. Subject to chapter 91, [DLNR] shall adopt, amend, and repeal rules:

(1) Concerning the preservation, protection, regulation, extension, and utilization of, and conditions for entry into wildlife sanctuaries, game management areas, and public hunting areas designated by the department;
. . . .
(3) Concerning size limits, bag limits, open and closed seasons, and specifications of hunting gear which may be used or possessed; . . .
. . . .
The rules may . . . specify certain days of the week or certain hours of the day in designating open seasons[.]
HRS § 183D-3 (1993) (emphases added). Since the addition of two extra hunting days to each week of the hunting season concerns "conditions for entry into . . . game management areas, and public hunting areas designated by [DLNR]" and "open . . . seasons" for hunting, the express language of HRS § 183D-3 mandates that to add the two weekdays for bird hunting, DLNR must amend HAR § 13-122-4 pursuant to HRS chapter 91.
We reject State Defendants' argument that HAR § 13-122-4(b) authorized the Board's chairperson to add Wednesdays and Thursdays as permissible days for game-bird hunting. HAR § 13-122-4(b) allows the Board or its authorized representative to "lengthen hunting seasons . . . whenever, after study [by] the division [of forestry and wildlife], the action is deemed to be in the public interest." HAR § 13-122-4(b) (emphases added). First, there is no indication in the record that the division of forestry and wildlife conducted a study that determined that adding two hunting days a week was in the public interest. Second, the ordinary meaning of the word "lengthen" is "to make longer." Merriam-Webster's Collegiate Dictionary 665 (10th ed.2000). In the context of HAR § 13-122-4(b), "lengthen" logically refers to adding days to the beginning or end of a hunting season to make the season longer. Adding Wednesdays and Thursdays as hunting days during a season will not have the effect of lengthening the hunting season as set forth in Exhibit 1 and incorporated as part of HAR § 13-122-4. Thus, HAR § 13-122-4(b) did not authorize DLNR's actions.

2.
Hawai`i case law supports the conclusion that DLNR's failure to follow the procedures outlined in HRS § 91-3 voids the addition of Wednesdays and Thursdays as permissible days for game-bird hunting.
In Vega v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., Inc., 67 Haw. 148, 682 P.2d 73 (1984), the Hawai`i Supreme Court considered a rule promulgated by the Insurance Commissioner of the State of Hawai`i (the Commissioner) pursuant to the Hawaii Motor Vehicle Accident Reparations Law (the no-fault-insurance law). The rule mandated that any no-fault-insurance policy "issued or renewed on or after September 1, 1974 shall provide the coverage required of a no-fault policy in accordance with the endorsement prescribed by the Commissioner or such modification thereof approved in writing by the Commissioner prior to its issuance." Id. at 149, 682 P.2d at 74-75. The basic no-fault endorsement prescribed by the Commissioner for inclusion in all motor-vehicle-insurance policies contained a specific clause that compelled "an injured person eligible for no-fault *134 benefits to `submit to medical examination by physicians selected by, or acceptable to, the insurer when, and as often as, the insurer may reasonably require.'" Id., 682 P.2d at 75 (brackets and ellipses omitted). An insured whose no-fault benefits were retroactively terminated for refusal to appear for a scheduled independent medical examination challenged this endorsement, which was included in her no-fault insurance policy.
In invalidating the endorsement, the Hawai`i Supreme Court initially noted that under the no-fault-insurance law,
[the Commissioner] was charged with the function of implementing a new system of motor vehicle accident reparations and vested with ample authority to develop the detailed regulations necessary for its enforcement.
. . . .
Hence, there is little doubt about [the Commissioner's] power to require all no-fault policies to provide a basic coverage which in his considered opinion would be consistent with the No-Fault Insurance Law and its purpose.
Id. at 154, 682 P.2d at 77. The supreme court determined, however, that the endorsement was "a nullity" because
when the Commissioner prescribed the Basic No-Fault Endorsement for all insurers issuing motor vehicle insurance policies, he did not follow the procedure set forth in the [HAPA]. In our view[,] HRS Chapter 91 also governed the issuance of the endorsement itself, and the Commissioner's neglect rendered the prescript fatally defective, except for those portions reflecting what the legislature had already prescribed in HRS Chapter 294.
Id., 682 P.2d at 77. See also Aguiar v. Hawaii Housing Authority, 55 Haw. 478, 490 & 493, 522 P.2d 1255, 1263 & 1265 (1974) (holding that amendments to the Master Management Resolution adopted by the Hawaii Housing Authority (HHA) that fundamentally altered the rate structure for public-housing rents, and thus changed the rent amount paid by nearly every public-housing tenant, constituted "rules" that were required to be adopted pursuant to HAPA).
In accordance with Vega and Aguiar, we conclude that DLNR was required to amend its rules pursuant to HRS chapter 91 before it could add two extra days per week for hunting game birds on the island of Hawai`i during the 2004-2005 hunting season. Since it did not, its addition of hunting days cannot be given effect.
C. Whether the Stamp Fees were Validly Adopted
Appellants contend that the circuit court erred in concluding that DLNR was authorized to require payment of the stamp fees as a condition of obtaining a hunting license. Appellants raise two issues regarding the sale of stamps: (1) whether DLNR is authorized to sell the stamps, and (2) whether DLNR must establish the fees for the stamps through the rulemaking procedures of HRS chapter 91.
Appellants argue that DLNR lacks authority to charge fees for the stamps because there is no enabling statute authorizing the sale of stamps in HRS chapter 183D. This argument is without merit. HRS § 183D-22 (Supp.2006), as last amended in 1999, expressly provides that "[a] hunting license shall be issued to a person by an agent of the department upon . . . [p]ayment of a hunting license fee or any other hunting related fee the [B]oard may require as provided in this chapter[.]" (Emphasis added). HRS § 183D-10.5, which establishes a wildlife revolving fund, authorizes DLNR to collect, for deposit into the fund, "[m]oneys collected from the sale of . . . [a]ny article, in addition to a hunting license, which a person is required to purchase from [DLNR] in order to hunt, when the requirement is established by law or rule[.]" (Emphasis added.) These two statutes provide the authority for DLNR to require payment of a fee for a hunting-related article such as a stamp.
Nevertheless, Appellants are correct that the stamp fees must be established through the rulemaking procedures set forth in HRS chapter 91. HRS § 183D-3 states that "[s]ubject to chapter 91, [DLNR] shall adopt, amend, and repeal rules . . . [s]etting fees for activities permitted under this chapter, unless otherwise provided for by law." *135 (Emphases added.) Since hunting, specifically game-bird hunting, is an activity permitted under HRS chapter 183D, DLNR is required to adopt a rule pursuant to HRS § 91-3 when setting the stamp fees for hunting. Moreover, State Defendants acknowledge that all stamp fee revenues are being deposited into the wildlife revolving fund. Pursuant to HRS § 183D-10.5, moneys collected from the sale of articles (such as stamps) that a person is required to purchase from DLNR in order to hunt may be deposited into the revolving fund only "when the requirement is established by law or rule[.]"
State Defendants argue that the Board validly promulgated HAR § 13-122-5.1(a) (1999), "which implements the statutory authority to require and charge a [stamp] fee[.]" This rule states, in pertinent part:

Application, tags, and stamps. (a) The department shall have the authority to require application forms for the selection of hunters and may require the use of tags or stamps or both, for purposes of hunting game birds. The department may establish fees for wildlife stamps, application fees, and tags for special or lottery hunts; and determine the manner in which such tags or stamps may be affixed, displayed, or utilized. Fees set for each of the following: application fees, tags, and stamps shall not exceed the cost of a hunting license, with the exception that the [B]oard reserves the right to establish higher application fees for specific hunts that require special accommodations including, but not limited to, helicopter transportation costs.
HAR § 13-122-5.1(a) (emphases added).
In Vega, the defendants and the Insurance Commissioner similarly argued that
the mandatory inclusion of a provision for compulsory medical examinations in every no-fault policy is valid because statutory requisites were met when the Rules and Regulations Relating to the Hawaii Motor Vehicle Reparations Act were adopted. Since one of the rules sanctioned the issuance of the basic endorsement, . . . nothing more was necessary to lend validity to the endorsement or any of its provisions.
Vega, 67 Haw. at 154-55, 682 P.2d at 78. Disagreeing with this argument, the Hawai`i Supreme Court held that
the [HAPA] demands more of a public administrator when he [or she] acts in a quasi-legislative capacity.
Although [HAR] § 16-23-60 of the promulgated rules enabled the Commissioner to prescribe endorsements, it by no means gave him "carte blanche to sidestep the independent requirements" of HRS Chapter 91. Aguiar v. Hawaii Housing Authority, 55 Haw. 478, 493, 522 P.2d 1255, 1265 (1974). See also Koolauloa Welfare Rights Group v. Chang, 65 Haw. 341, 344, 652 P.2d 185, 187 (1982). A "rule" for purposes of the chapter includes "each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy." Reading the pertinent part of the Basic No-Fault Endorsement with the foregoing definition in mind, we can only conclude it is a "rule" as defined by HRS § 91-1(4) and it should have been adopted as such in accord with the procedure set forth in HRS § 91-3.
The Commissioner's prescription of the Basic No-Fault Endorsement caused a specific clause compelling a benefit claimant to submit to medical examinations as directed by the insurer to be included in every no-fault policy written in Hawaii. The provision in the endorsement that brought this about could only be a "statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy." HRS § 91-1(4). It undoubtedly "touches the affairs of the entire `public,'" and "delineates the future rights of an entire class of unnamed individuals." Aguiar v. Hawaii Housing Authority, 55 Haw. at 485-86, 522 P.2d at 1261.
"Where an administrative agency seeks to promulgate a `rule,'" it "must consider the views of interested persons," id. at 487-88, 522 P.2d at 1262; for the "powers of government should not be used in a manner giving an appearance of being arbitrary." In re Western Motor Tariff Bureau, Inc., 53 Haw. 14, 19, 486 P.2d 413, *136 416 (1971). And since the Commissioner neither afforded interested persons an opportunity to be heard nor considered their views with respect to a proposed rule as required by [HAPA], the purported promulgation of the "rule" relating to compulsory medical examinations was a nullity. See HRS § 91-3(a)(1) and (2).
Vega, 67 Haw. at 155-56, 682 P.2d at 78 (brackets, ellipses, and footnote omitted). See also Aguiar, 55 Haw. at 493, 522 P.2d 1255 (holding that a clause in a standard lease allowing rent increases based on HHA's "established rent schedule" "does not accord HHA a carte blanche by which it may sidestep the independent requirements of the HAPA" before raising rents and the rent structure for public housing).
Here, HRS § 183D-3 expressly requires any amendments to DLNR rules to be made pursuant to HRS chapter 91. Therefore, DLNR was not allowed to sidestep the rulemaking procedures set forth in HRS chapter 91 by administratively requiring that stamps be purchased as a condition for obtaining a hunting license and setting the fees for the stamps. "Rules are necessary to ensure fairness and to minimize unbridled use of discretion of an agency." Aluli v. Lewin, 73 Haw. 56, 62, 828 P.2d 802, 805 (1992). The rulemaking procedures set forth in HRS chapter 91 require public notice of a proposed rule, an opportunity for the public to provide input on a proposed rule, and consideration by the agency of any public comments before implementing, interpreting, or prescribing law or policy regarding game-bird hunting.
While HAR § 13-122-5.1(a) authorizes DLNR to establish "fees for wildlife stamps" and sets a cap for such fees, such authorization does not, and could not, exempt DLNR from complying with the rulemaking procedures set forth in HRS chapter 91 when DLNR: (1) requires members of the public to purchase wildlife-conservation and bird-hunting stamps in order to obtain a hunting license; or (2) sets the fees for these stamps at $10, the maximum cap imposed by HAR § 13-122-5.1(a).

CONCLUSION
Based on the foregoing discussion, we agree with Appellants that DLNR exceeded its authority when it allowed game-bird hunting on Wednesdays and Thursdays during the 2004-2005 hunting season and exacted stamp fees from Appellants without going through the rulemaking procedures set forth in HRS chapter 91. Accordingly, we reverse the circuit court's judgment as to these claims. We affirm that part of the judgment that resolved the black-powder count in Yamada's favor.
NOTES
[1] The Honorable Glenn S. Hara presided.
[2] Hawaii Revised Statutes (HRS) § 171-9 (1993) divides the State of Hawaii into four land districts and defines the boundaries of these land districts.
[3] Hawaii Administrative Rules (HRS) § 13-122-4 (1999) states:

Bag limits, open seasons and hunting days. (a) Bag limits, open seasons, hunting days, and game birds that may be hunted are listed in Exhibits 1, 3, 5, 7, 9, and 11, located at the end of this chapter and by reference made a part hereof.
(b) The [B]oard or its authorized representative may add conditions and restrictions for hunts; set bag limits; limit, suspend, or postpone the hunting of any game bird, or hunting in any area open to hunting, including cooperative hunting areas and natural area reserves; lengthen hunting seasons; and open special hunting areas or seasons; whenever, after study by the division, the action is deemed to be in the public interest. Where special conditions are needed for a particular hunt, they shall be prescribed on specially prepared instruction sheets for that specific hunt, which by reference shall be made a part hereof these rules.
HAR § 13-122-2 (1996) defines "[d]ivision" as "the division of forestry and wildlife."
[4] Exhibit 1 is a table that sets forth for the island of Hawai'i the game birds to be taken, the daily bag limits, the open periods, the open hunting days, and special conditions and restrictions for hunting.
[5] HRS § 183D-21 (Supp.2006), as last amended in 1998, states, in pertinent part:

Hunting licenses required. No person shall hunt, pursue, kill, or take any game bird or mammal without first procuring a hunting license[.]
[6] HRS § 183D-22 (1993 & Supp.2006), as last amended in 1999, states, in pertinent part:

Application and issuance of licenses; fees. (a) A hunting license shall be issued to a person by an agent of the department upon:
. . . .
(2) Payment of a hunting license fee or any other hunting related fee the [B]oard may require as provided in this chapter;. . . .
. . . .
(b) The hunting license fee shall be:
(1) $10 for any person who has resided in the State for one year or longer, or who is a member of the armed forces of the United States on active duty and the spouse and children thereof, or who elects to forgo [sic] the exemption provided in paragraph (3);
(2) $95 for all other persons; and
(3) Free to all Hawaii residents sixty-five years of age or older and to all persons with Hansen's disease who are residents of Kalaupapa, Molokai.
[7] In his complaint, Plaintiff-Appellant Katsuya Yamada (Yamada) acknowledged that Hawaii Administrative Rules (HAR) § 13-122-4 authorized Defendant-Appellee Department of Land and Natural Resources, State of Hawaii (DLNR) to "lengthen the hunting seasons" whenever, after a study by the division of wildlife and forestry, such action was "deemed to be in the public interest[.]" However, Yamada contended that HAR § 13-122-4 did not authorize DLNR to alter the hunting days. Additionally, Yamada maintained, based on information and belief, that the division had not conducted any study to determine if the addition of Wednesdays and Thursdays as hunting days was in the best interest of the public. Yamada also alleged:

15. The inclusion of Wednesdays and Thursdays as bird hunting days was done only at the request of a few hunters wanting to train their dogs when the game management areas are not saturated with other hunters.
16. The inclusion of additional days in hunting areas follows a year when the hunting seas [sic] was very poor because of the prolonged drought in the game management areas and is predicted to be "fair" for the coming year because of the loss of the brood stock in the previous years.
17. That the inclusion of the additional days will further reduce the brood stocks and cause irreparable damage to the game bird population which will take years to recover.
During oral arguments before this court, Yamada also indicated that Appellants are opposed to the addition of weekday-hunting days because when hunting occurs in game management areas, game birds tend to run uphill or fly to adjoining lands and not return to the game-management areas for at least a week.