**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-18-0000677
29-JUL-2025
09:29 AM
Dkt. 23 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

In re FT, by and through ALOHA NURSING REHAB CENTRE,
Petitioner/Appellant-Appellant,

vs.

DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAI'I,
Respondent/Appellee-Appellee.

SCWC-18-0000677

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-18-0000677; CASE NO. 1CC171002012)

JULY 29, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.,

OPINION OF THE COURT BY EDDINS, J.

This case involves whether a skilled nursing facility may initiate an administrative hearing contesting the Department of Human Services' termination of its Medicaid-recipient resident's eligibility.

A skilled nursing facility accepted a new resident receiving Medicaid benefits. Upon admission, the resident's

husband was designated as her authorized representative. Thus, he was authorized to communicate with the Department of Human Services (DHS) (the agency that administers Hawai'i's Medicaid program) on her behalf.

Nearly two years after her admission to the facility, DHS realized the resident had too many assets to qualify for Medicaid. It ended her benefits. When her benefits were terminated, the resident and her husband (her authorized representative) had been deemed incapacitated. Husband had a public guardian, and the State was in the process of appointing the resident a guardian.

The nursing facility found out the resident was no longer eligible for Medicaid because its bills stopped getting paid. It is unclear whether notice of ineligibility was issued at the time, and to whom.

After the State appointed the resident a public guardian, the guardian submitted a new Medicaid application on her behalf. DHS denied the application. DHS said it sent out a denial notice, but no one knows who the notice was sent to. DHS said it made a mistake – the resident was never eligible for Medicaid because she still had a home in trust. (The family refused to work with the facility to satisfy the medical debt with trust assets or to place a lien on the home.)

The nursing home cared for the resident without compensation for almost another two years, until she passed away.

DHS refused to compensate the facility. Nearly two years after the resident's death, the nursing home sought an administrative hearing to challenge DHS' 2013 eligibility decision. The appeals office denied the request because the nursing home was not an authorized representative, and the appeal came too late. (The authorized representative, her husband, was also deceased.)

The circuit court and Intermediate Court of Appeals (ICA) affirmed the denial and held that the nursing home lacked standing to challenge DHS' eligibility determination because it was not the applicant (the resident) or an authorized representative per Hawai'i Revised Statutes (HRS) § 346-12 (2015).

We disagree with the lower courts regarding standing. We hold that skilled nursing facilities have constitutionally-protected property interests in compensation for medical services performed for residents in reliance on Department of Human Services eligibility determinations. Based on this property interest, these facilities have due process rights under article I, section 5 of the Hawai'i Constitution.

Skilled nursing facilities are entitled to notice and the opportunity to appeal Medicaid eligibility determinations when (1) the facility has provided care for an individual approved for Medicaid benefits, (2) the beneficiary is unable to appeal a later determination of Medicaid ineligibility due to incapacity, and (3) no authorized representative is available or willing to appeal the eligibility denial on behalf of the beneficiary.

**I.**

Aloha Nursing Rehab Centre (Aloha), a nursing home specializing in skilled nursing and hospice care, accepted FT as a permanent resident in March 2011. It accepted her based on the Department of Human Services determination that she was Medicaid eligible. FT's authorized representative, her husband, signed a facility services agreement authorizing the release of information to Aloha and assigning payment of FT's Medicaid benefits to Aloha.

In July 2012, FT's husband's healthcare provider filed an emergency petition asking the court to find him incapacitated and appoint the Office of the Public Guardian (OPG) as his guardian. In November 2012, the court did so. From then on, FT's authorized representative lacked capacity to act on her behalf.

In September 2012, Aloha filed a petition asking the court to find FT incapacitated and appoint OPG. In January 2013, the

4

court found FT incapacitated and appointed OPG as her guardian. Because of the guardianship proceedings, the State knew that both FT and her husband lacked capacity.

In November 2012, before OPG was appointed as FT's guardian, DHS terminated FT's Medicaid benefits. Although it did not receive a formal notice, Aloha found out about the situation because its bills stopped getting paid. FT had a house in trust, so she was over the Medicaid income limit.

Aloha tried to work with FT's family to get the house out of trust and make her eligible again, but was unsuccessful.

In June 2013, OPG submitted a new application for Medicaid benefits on FT's behalf. In July 2013, DHS sent a denial notice explaining that FT's home made her ineligible. To whom DHS sent this notice is unknown.

In June 2014, FT died. In June 2015, Aloha wrote to FT's adult children, in their capacities as co-conservators of FT's trust containing the house. Aloha claimed that its debt was enforceable against trust assets, namely, the house. It asked the children to cooperate by placing a lien on the house; otherwise it would sue.

In September 2015, Aloha sued the trust, demanding that trust assets satisfy Aloha's debt. In June 2016, Aloha withdrew its suit after repeatedly being unable to serve the only child who served as the trustee.

Unable to get assets from the trust, Aloha met with DHS in February 2016, seeking reimbursement for its care from 2012, when FT was declared ineligible for Medicaid, until her death in 2014. DHS refused, explaining "that they had made a mistake and that FT should never have been Medicaid eligible" because her home was in a revocable trust the entire time.

In April 2016, Aloha sent a letter asking DHS for $121,831.99 in reimbursement. DHS responded in June 2016, denying Aloha's request. In July 2016, Aloha asked DHS to reconsider its denial. DHS rejected that request in August 2016.

In September 2016, Aloha requested a hearing with the DHS Administrative Appeals Office (AAO). Aloha argued that the hardship and lack of notice justified waiving the denial of eligibility. The AAO dismissed the hearing request for two reasons: Aloha was not authorized to represent FT, and the hearing request was submitted over ninety days from the termination of benefits notice.

Aloha appealed. In March 2017, the circuit court reversed the AAO's decision to dismiss Aloha's request for a hearing. It remanded to the AAO to determine whether Aloha had standing to litigate on FT's behalf.

On remand, the AAO sided with DHS. Because Aloha had not produced evidence to establish that it was FT's authorized

representative, it had no right to contest DHS' denial of its request for payment. That FT and her authorized representative were both incapacitated didn't matter - FT had a legal guardian (OPG) from January 29, 2013 until her death. Thus, the hearings officer said, Aloha did not have standing, third-party or otherwise, to request a hearing.

In July 2018, the circuit court affirmed the AAO's decision. The court concluded that Aloha lacked standing to initiate a contested case hearing. The relevant statute, HRS § 346-12, limits parties who can request such a hearing solely to the applicant or recipient themselves. The statute does not extend to third parties, the circuit court said. It also concluded that Aloha's relationship to FT was not a "close relationship" for third-party standing purposes, but rather "that of a creditor and debtor under a contract."

Aloha appealed. The ICA affirmed the circuit court. It ruled that Aloha lacked standing under HRS § 346-12. HRS § 346-12 only entitles an "applicant or recipient" of services or public assistance to appeal DHS decisions. Aloha was neither, the ICA said, so the circuit court correctly affirmed the AAO's denial of Aloha's third-party standing. Aloha "did not show FT was unable to protect her own interests." Instead, the record showed that FT had a legal guardian from January 2013 – one

7

month after DHS terminated her Medicaid benefits – until her death in June 2014.

Aloha applied for cert, and we accepted. Aloha maintains that it may challenge the lack of notice and seek an administrative hearing on DHS' eligibility determination.

We hold that Aloha has a constitutionally-protected property interest in its reimbursement for Medicaid services provided to FT. Due process thus requires notice to Aloha, and the opportunity to be heard at a DHS contested case hearing regarding FT's eligibility. Given Aloha's reliance on DHS' initial Medicaid eligibility decision, the likely loss of $100,000+ in reimbursements and the minimal burden on DHS to hold a hearing on FT's eligibility, a contested case is required to satisfy due process. Because Aloha has a protected property interest in reimbursement, we also hold that it has standing to challenge DHS eligibility decisions that may adversely affect those interests. It may request a contested case hearing covering its resident's eligibility. We remand to the AAO for a hearing on the merits.

**II.**

Lucky we live Hawai'i. Hawai'i leads the nation in life expectancy. Andrew Mason & Michael Abrigo, Aging and Hawai'i's Generational Economy 1 (UHERO 2024). That positive statistic correlates to a growth in the numbers and percentage of our

8

elderly population.  Studies suggest that in ten years, one in four Hawai'i residents will be 65 or older.  Id.  And as our kūpuna age, health care costs increase.  Id. at 21.

Hawai'i faces a long-term care facility shortage.  Madeleine List, Why Many Patients Are Stuck In Hospitals Waiting For Long-Term Care Beds, Honolulu Civ. Beat (Aug. 25, 2023), https://www.civilbeat.org/2023/08/why-many-patients-are-stuck-in-hospitals-waiting-for-long-term-care-beds/ [https://perma.cc/C8JJ-STX2].  Patients hospitalized for acute conditions and requiring higher levels of care are sometimes waitlisted for months before finding a long-term care placement.  Id.; State Health Planning and Development Agency, Health Care Utilization Report 85-87 (2022).  In 2022, for example, in some facilities up to thirty percent of beds per facility were unusable due to staffing shortages.  See Health Care Utilization Report, supra, at 80-82.  So even kūpuna with resources struggle to find placements for long-term care.  See id.  These long wait times strain acute care hospital capacities and negatively impact patients and their families.  List, supra.

The care shortage is worse for patients receiving Medicaid.  Reportedly, "[p]atients on Medicaid have more difficulty finding placements because some facilities are reluctant to take them in."  List, supra; see United States General Accounting Office, Admission Problems for Medicaid Recipients and Attempts to Solve

9

Them 14 (1990) ("[I]t is generally conceded that Medicaid recipients have more trouble getting into nursing homes than private payers, there are little data available, either at the national or state level, on the extent and severity of access problems."). Medicaid reimbursement rates are lower than what private pay residents pay per day. David C. Grabowski & Joseph J. Angelelli, The Relationship of Medicaid Payment Rates, Bed Constraint Policies, and Risk-Adjusted Pressure Ulcers, 39 Health Servs. Rsch. 793, 795 (2004) ("The Medicaid rate is, on average, about 70 percent of the private-pay price."). Though federal law prohibits nursing facilities from asking residents to waive their rights to Medicaid and Medicare benefits upon admission, nursing homes may still elect to deny admission to people receiving Medicaid benefits in favor of those able to pay the higher private rate. See 42 U.S.C § 1396r(c)(5)(A)(i).

Nursing facilities are essential to Hawaiʻi's long-term care infrastructure and kūpuna population. See Scott Suzuki, Long-Term Care in Hawaii, 19 Haw. B.J. 59, (2015) (other long-term care options include in-home care, senior housing, adult residential care homes, assisted living, and community care foster homes). These facilities "provide[] skilled nursing and related services to residents who require twenty-four hour a day medical or nursing care, or rehabilitation services, including but not limited to physical therapy, occupational therapy, and

10

speech therapy services."  Hawai'i Administrative Rules (HAR) § 11-94.2-2.  And for some who require skilled nursing care, nursing homes are where they live out their final years.

The hardship nursing facilities face when our state's Medicaid program revokes eligibility after a facility has cared for a resident is troubling.  When the Medicaid beneficiary and their authorized representative lack capacity, and when the Office of the Public Guardian (if appointed) chooses not to appeal, private facilities don't get paid.  Based on the government's representation that the person was initially Medicaid eligible, the facility admitted a new patient.  Now they're left holding the bag, trying to recover from family members or the government.  Or even, as a last resort, discharging a vulnerable resident.  Long-term and end-of-life care facilities are valued, necessary fixtures in Hawai'i's support system for kūpuna.

It is also unsettling that when Medicaid cuts a nursing facility resident's benefits, and no one is willing or able to appeal, those actions go unreviewed.  See Alaka'i Na Keiki, Inc. v. Matayoshi, 127 Hawai'i 263, 275, 277 P.3d 988, 1000 (2012) (statutory delegation of judicial power that precludes judicial review of the agency's decision may raise separation of powers issues); AlohaCare v. Dep't of Hum. Servs., 127 Hawai'i 76, 86, 276 P.3d 645, 655 (2012) ("[S]eparation of powers concerns may

arise when the legislature vests administrative agencies with judicial power but precludes judicial review of the agency's decisions. . . . Absent judicial review, the agency is left to decide the legality of its own actions, meaning that there is no 'check' on the propriety of the agency's actions under the law.").

We hold that nursing facilities like Aloha have a constitutionally-protected property interest in reimbursement for Medicaid-related services. Where an individual receiving Medicaid benefits does not have an authorized representative willing or able to appeal an adverse agency decision, a skilled nursing facility providing care to the person must receive notice, and the opportunity to appeal a DHS Medicaid eligibility determination.

We begin with the general framework for DHS Medicaid appeals.

**A.   The Medicaid appeals process**

First, HRS Chapter 346.

HRS § 346-12 provides for administrative appeals of adverse Medicaid decisions. "An applicant or recipient, deeming oneself aggrieved, shall be entitled to appeal to the [DHS] director in the manner prescribed by department rules." HRS § 346-12. The statute provides that an applicant or recipient "shall be afforded reasonable notice and opportunity for a hearing at

which all of the evidence presented by the parties, to the extent allowed by chapter 91, shall be considered in a fair and impartial manner." Id.

Per HRS § 346-1 (2015), "applicant" means "the person for whose use and benefit application for services or public assistance is made." "Recipient" means "the person for whose use and benefit services are rendered or a grant of public assistance is made." Id. "Applicant" and "recipient" thus mean the person receiving Medicaid benefits. See id.

HRS § 346-12 incorporates DHS rules by reference. Those rules allow an "authorized representative" to advocate for a beneficiary in an administrative proceeding. HAR § 17-1703.1-3(d)(3). The representative must be authorized to act on behalf of the individual. HAR § 17-1703.1-3(c) ("[An individual's] written authorization shall be received by the department before the department acknowledges any action taken by the authorized representative on the individual's behalf.").

This regulation is consistent with federal Medicaid requirements. Per 42 CFR § 435.923, state agencies tasked with administering Medicaid must allow beneficiaries to designate authorized representatives:

> (a)(1) The agency must permit applicants and beneficiaries to designate an individual or organization to act responsibly on their behalf in assisting with the individual's application and renewal of eligibility and other ongoing communications with the agency. Such a designation must be in accordance with paragraph (f) of

13

> this section, including the applicant's signature, and must be permitted at the time of application and at other times.
>
> > (2) Authority for an individual or entity to act on behalf of an applicant or beneficiary accorded under state law, including but not limited to, a court order establishing legal guardianship or a power of attorney, must be treated as a written designation by the applicant or beneficiary of authorized representation.

42 CFR § 435.923.

Individuals or entities who are not the applicant or beneficiary, or who are not the authorized representative, according to the rule, may not challenge eligibility determinations. HAR § 17-1703.1-3(d)(3).

This rule still applies to most Medicaid appeals. We hold, however, that under certain circumstances, skilled nursing facilities have standing to appeal adverse DHS Medicaid eligibility determinations affecting facility residents admitted with Medicaid benefits.

**B.    Skilled nursing facilities have constitutionally-protected property interests in reimbursement for Medicaid services**

Skilled nursing facilities have constitutionally-protected due process rights to notice when a facility resident's Medicaid benefits are adversely impacted by an ineligibility determination. They also have the right to an administrative hearing challenging the ineligibility determination.

Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Haw. Const. art. I, § 5. "We have

14

long recognized that '[c]onstitutional due process protections mandate a hearing whenever the claimant seeks to protect a "property interest," in other words, a benefit to which the claimant is legitimately entitled.'"  In re Application of Maui Elec. Co., Ltd. (MECO), 141 Hawai'i 249, 260, 408 P.3d 1, 12 (2017).

Procedural due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest.  Sandy Beach Def. Fund v. City Council of City & Cnty. of Honolulu, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989) (citing Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).

Protected property interests implicate the Hawai'i Constitution's due process clause, but are not themselves a product of that clause.  See MECO, 141 Hawai'i at 260, 408 P.3d at 12.  "The legitimate claims of entitlement that constitute property interests are not created by the due process clause itself."  Id.  Instead, "they are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law — rules or understanding that secure certain benefits and that support claims of entitlement to those benefits."  Id. (quoting In re 'Īao Ground Water Mgmt. Area High-Level Source Water Use Permit Applications ('Īao), 128 Hawai'i 228, 241, 287 P.3d 129, 142 (2012)).

15

A party must demonstrate a true entitlement to establish a property interest.  This court explained that "a party has a property interest in the subject of litigation for purposes of due process analysis if the party has 'more than an abstract need or desire for it.  [They] must have more than a unilateral expectation of it.  [They] must, instead, have a claim of entitlement to it.'"  'Iao, 128 Hawai'i at 241, 287 P.3d at 142 (quoting Sandy Beach Def. Fund, 70 Haw. at 376, 773 P.2d at 260; Pele Def. Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 68, 881 P.2d 1210, 1214 (1994) ("Constitutional due process protections mandate a hearing whenever the claimant seeks to protect a 'property interest,' in other words, a benefit to which the claimant is legitimately entitled.").

Nursing facilities' protected property interest in payment for services performed for facility residents arises from DHS rules.  See 'Īao, 128 Hawai'i at 241, 287 P.3d at 142.  According to DHS administrative rules, nursing facilities are entitled to reimbursement for services provided to Medicaid residents.  Nursing facilities accredited for short-term rehabilitation and long-term nursing care are reimbursed by the Medicaid long term care prospective payment system via facility-specific prospective per diem rates:

> (b) Except as noted herein, the Medicaid program shall pay for institutional long-term care services through the use of a facility-specific prospective per diem rate.

16

HAR § 17-1739.2-3(b); see 42 CFR § 447.252(b) ("The [state] plan must specify comprehensively the methods and standards used by the agency to set payment rates in a manner consistent with [42 CFR § 430.10 state plan written requirements]."). Federal law also requires state plans to provide for provider reimbursement according to rates that the state "finds, and makes assurances satisfactory to the [federal Department of Human Services] Secretary," are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . ." 42 CFR § 447.250.

Medicaid payments for services performed are rule-based entitlements based on agreements with DHS. To establish Medicaid reimbursement eligibility, providers such as nursing facilities must complete Enrollment Form 1139. According to the Provider Enrollment Form Nursing Facility Attachment, DHS must reimburse nursing facilities for authorized Medicaid services:

> DHS shall reimburse the FACILITY for authorized [Nursing Facility (NF)] services provided to residents. Reimbursements shall be limited to services rendered in the areas of the FACILITY, which are licensed by the State Department of Health as a NF under 42 C.F.R. Part 483.

Med-Quest Division, Provider Enrollment Form (Rev. 2022), at 52 (available at: https://medquest.hawaii.gov/content/dam/formsanddocuments/resources/Provider-Resources/hoku/DHS_1139_Form_Rev_11_2022.pdf) [https://perma.cc/P7TF-V7E4].

17

Keahole Defense Coalition held that certain government "benefits" do not constitute "statutory entitlement" conferring a legitimate property interest. Keahole Def. Coal., Inc. v. Bd. of Land & Nat. Res., 110 Hawai'i 419, 433, 134 P.3d 585, 599 (2006). A telecommunications provider did not have a "statutory entitlement" to an exclusive license issued by the Department of Hawaiian Home Lands because the agency has discretion to grant licenses and determine the terms of any leases granted. Id. at 433-34, 134 P.3d at 599-600. Where the government has discretion – such as deciding whether to grant or deny state operating licenses – the lack of entitlement bars property interest-based claims. See id. (citing Thornton v. City of St. Helens, 425 F.3d 1158, 1164 (9th Cir. 2005).

DHS does not have discretion as to whether it may reimburse facilities for services performed. If a resident is eligible for Medicaid, then DHS must reimburse the facility when it provides care for a nursing home resident. See HAR § 17-1739.2-3(b); 42 CFR § 47.252. That is not to say that Medicaid is required to pay for *unauthorized* services. See HAR § 17-1739.2-3(b). Because the requirement that Medicaid "pay for institutional long-term care services through the use of a facility-specific prospective per diem rate" is not discretionary, it constitutes an entitlement giving rise to a protected property interest. See id.

18

Thus, by rule – and by DHS' agreement with licensed nursing facilities - skilled nursing facilities are entitled to payment for Medicaid services performed for eligible beneficiaries.  See 'Iao, 128 Hawai'i at 241, 287 P.3d at 142; HAR § 17-1739.2-3(b).

Other jurisdictions support our conclusion.  In Oberlander v. Perales, the Second Circuit Court of Appeals held that a skilled nursing facility licensed as a Medicaid provider, under New York law, had a "property interest in money paid for services already performed in reliance on a duly promulgated reimbursement rate."  740 F.2d 116, 120 (2d Cir. 1984).  Thus, the provider had federal due process rights.  Id.  Pressley Ridge Schools, Inc. v. Stottlemyer also held that a behavioral health care provider's "interest in receiving reimbursement for services to Medicaid recipients is a protectable property interest under the Fourteenth Amendment."  947 F.Supp. 929, 940 (S.D. W. Va. 1996).

Federal courts have also held that a provider's property interest begins when the notice of eligibility is issued.  In Anchorage SNF, LLC v. Padilla, the U.S. District Court for the District of Maryland held that the nursing facilities' property interest in payment for services provided began when an applicant or nursing home resident "receives a Notice of Eligibility":

> [Other federal cases] determined the medical providers had a property interest in payments for services previously rendered. For the purposes of the Motion, the court is satisfied that <u>once an applicant/resident receives a Notice of Eligibility, Plaintiffs' property interest in payment for services rendered is born.</u> The Notice of Eligibility signals to the applicant and Plaintiffs that the applicant is eligible for the services offered by Plaintiffs, and Plaintiffs will be paid for those services once rendered. Accordingly, the court finds, that <u>Plaintiffs have a property interest in payments for services rendered to eligible residents.</u>

<u>Anchorage SNF</u>, No. 1:22-cv-00166-JRR, 2023 WL 1107994, at *8 (D. Md. Jan. 30, 2023) (mem. op.) (emphases added).

We reach a similar conclusion. By law, Medicaid recipients have no money to pay for humane care. 20 CFR § 416.1205 (the resource limit for Medicaid recipients is $2,000). A notice of eligibility signals the government's endorsement that residents are covered by Medicaid upon admission. While eligibility may change, facilities rely on these initial determinations.

In Hawai'i, a long-term care provider's reimbursement rate is set by Med-Quest. <u>See</u> HAR § 17-1739.2-3. Providers are reimbursed "based on the number of days of care that the provider delivers to the resident, the acuity level that is medically necessary for each day of care, and the provider's [prospective payment system] rate." <u>See</u> HAR § 17-1739.2-3(a); HAR § 17-1700.1-2 ("'Acuity level or level of medical care' means one of the following types of inpatient services: [nursing facility] or [intermediate care facility for individuals with intellectual disabilities].").  The prospective payment system

20

rate (the amount the facility is paid daily for caring for a Medicaid beneficiary) is facility-specific and based in part on historic cost.  See HAR § 17-1739.2-3; HAR § 17-1700.1-2 ("'PPS rate' means the prospective payment system annual rate assigned each Medicaid institutional provider.").  Aloha's daily rate as of January 2025, for example, was $528.49.  See Letter from Judy Mohr Peterson, PhD to QUEST Integration Health Plans, Medicaid Fee-for-Service Rates for All Nursing and Hospice Facilities Effective January 1, 2025 Thru June 30, 2025 (Dec. 12, 2024) (available at:

https://medquest.hawaii.gov/content/dam/formsanddocuments/provider-memos/qi-memos/qi-memos-2024/QI_2427.PDF)

[https://perma.cc/D8XT-JESZ].

When residents with Medicaid coverage are admitted, facilities like Aloha rely on the accuracy of DHS' Medicaid eligibility determination.  They anticipate payments for those services according to state-established daily rates.  HAR § 17-1739.2-3(b).

We hold that skilled nursing services provided in reliance on the Medicaid rate for Medicaid residents constitute a protected property interest.

A facility resident losing eligibility mid-stay does not sever this entitlement.  See Aguiar v. Hawaii Housing Auth., 55 Haw. 478, 493-94, 496, 522 P.2d 1255, 1265-67 (1974) (plaintiffs

21

whose leases were terminated for allegedly exceeding income limits had property interests in low-income housing benefits sufficient to require a pre-termination hearing). For sure, Medicaid will only reimburse providers for services provided to an eligible beneficiary. But continued services – based on a resident's Medicaid eligibility upon admission – does not change the status of a protected property interest in reimbursement. See id.

Here, the Medicaid compensation framework supports a nursing facility's property interest in reimbursement for provided services under Hawai'i law. See id.; HAR § 17-1739.2-3(b).

First, DHS regulations detail the daily rate providers are paid for providing Medicaid services to residents. HAR § 17-1739.2-3(b).

Second, Medicaid is a "vendor only" plan, where "payment ordinarily cannot be made to the recipient of medical assistance but can only be made to the vendor or provider of the services." 81 C.J.S. Social Security and Public Welfare § 267 (2024); 42 CFR § 447.10(d) ("Payment may be made only . . . [t]o the provider; or . . . [t]o [certain beneficiaries receiving the payment for physicians' or dentists' services per 42 CFR § 447.25.]"); see HAR § 17-1739.2-3 (requiring DHS to reimburse long-term care providers for services delivered). In other

words, beneficiaries living at nursing facilities never see these payments – DHS directly pays the medical provider.  Thus, this regulatory framework supports our holding that nursing facilities who have accepted Medicaid-eligible residents hold a property interest in Medicaid reimbursement for their services.

Nursing facilities are unique medical providers.  They care for individuals requiring high levels of care, where community or home care is not possible.  See HAR § 11-94.2-2 (nursing facilities provide twenty-four-hour care for residents who require medical and nursing care, or rehabilitation).  And they often care for elderly patients during their final years.

Because skilled nursing facilities offer twenty-four hour services, they are involved in nearly all aspects of a resident's care – housing, medical and behavioral care, activity programming, family visitation and relations, and more.  While the constitutionally-protected property interest in Medicaid reimbursement belongs solely to the nursing facility, its role in the client's care uniquely positions facilities to appeal an adverse decision where family, authorized representatives, or public guardians are unable or unwilling to assist.

Here, for example, while FT's authorized representative (her husband) lacked capacity to appeal on her behalf, the record does not explain why FT's public guardian did not step in to appeal the eligibility denial.  But under these

circumstances, to conclude that no other party has a right to appeal, blocks meaningful judicial review of DHS decisions. See AlohaCare, 127 Hawai'i at 86, 276 P.3d at 655 ("Absent judicial review, the agency is left to decide the legality of its own actions, meaning that there is no 'check' on the propriety of the agency's actions under the law.").

We hold that skilled nursing facilities have a protected property interest in Medicaid payment for services performed in reliance on Department of Human Services eligibility determinations, and thus, have due process rights under article I, section 5 of the Hawai'i Constitution. See Haw. Const. art. I, § 5; MECO, 141 Hawai'i at 260, 408 P.3d at 12.

Aloha had a protected property interest in payment for services provided to FT in reliance on DHS' initial eligibility determination. Thus, it was entitled to procedural due process: notice and the opportunity to be heard.

**C. Nursing facilities have due process rights to notice and the opportunity to be heard**

**1. Notice**

First, we hold that skilled nursing facilities are entitled to notice of adverse actions related to their residents' Medicaid eligibility.

Per the Department of Human Services Med-Quest Division's Administrative rules, it must provide notice of benefits

eligibility decisions to "individuals":

> **Notice of eligibility, or level of benefits and services.** (a) The department shall provide an individual with a written notice of <u>any decision by the department or designee affecting the individual's eligibility</u> for benefits and services approval, denial, termination, or suspension of benefits or services.

HAR § 17-1713.1-2(a) (emphasis added).

This administrative rule is consistent with federal law governing Medicaid. 42 CFR § 435.917 ("Consistent with §§ 431.206 through 431.214 of this chapter, the agency must provide all applicants and beneficiaries with timely and adequate written notice of any decision affecting their eligibility, including an approval, denial, termination or suspension of eligibility, or a denial or change in benefits and services.").

But now that skilled nursing facilities have constitutional protection, what notice is DHS required to provide?

Under Hawai'i law, the government's due process obligations are case specific. <u>Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res.</u>, 136 Hawai'i 376, 389, 363 P.3d 224, 237 (2015). Due process "calls for such procedural protections as the particular situation demands." <u>Id.</u> (quoting <u>Sandy Beach Def. Fund</u>, 70 Haw. at 378, 773 P.2d at 261). "[B]ut its basic elements are notice and an opportunity to be heard at a meaningful time and in a meaningful manner." <u>Davis v. Bissen</u>, 154 Hawai'i 68, 82, 545 P.3d 557, 571 (2024).

First, we discuss the notice requirement.  Adequate notice informs parties of the adverse action and informs them of the "procedures available for challenging that action."  Id.  Under these circumstances, due process requires notice to skilled nursing facilities of any adverse eligibility determination, and information regarding the facility's appeal rights.  See HAR § 17-1713.1-2; § 17-1703.1-4 (appeals of eligibility related decisions must be received by DHS within ninety calendar days of the date of the notice).  We hold that DHS must issue notice to skilled nursing facilities caring for residents when it issues adverse decisions related to a resident's Medicaid eligibility, including termination and suspension of benefits.

DHS is authorized to disclose otherwise confidential information to "Medicaid providers who require eligibility, cost share or [third-party liability] information for billing or recovery purposes."  HAR § 17-1702-5(b)(3)(C); see HRS § 346-10(c) (2015) ("The department shall promulgate and enforce such rules as may be necessary to prevent improper acquisition or use of confidential information."); 42 CFR § 431.306(a) ("The agency must have criteria specifying the conditions for release and use of information about applicants and beneficiaries.").  Confidential information includes, among other things, a patient's social and economic circumstances, DHS' "evaluation of recorded or unrecorded information about a particular

26

individual, whether or not an applicant or recipient," and "[c]orrespondence concerning a particular individual." HAR § 17-1702-4(a). Thus, DHS may disclose eligibility determinations to nursing facility providers. See HAR § 17-1702-5(b)(3)(C). While the rule may not have previously *required* eligibility disclosure, due process requires disclosure to skilled nursing facilities to provide notice of benefits termination.

Providing notice of resident Medicaid ineligibility is hardly an administrative burden for DHS. Medicaid payments are already assigned to the facility providing nursing care services to the beneficiary. The State also begins paying the daily rate for Medicaid residents upon their admission. See HAR § 17-1739.2-3(b). Thus, the information DHS needs to notify a resident's nursing facility of suspension or termination of Medicaid eligibility is easily accessible. And because this holding only impacts applicants and beneficiaries already receiving skilled nursing facility level care, it only affects a narrow category of Medicaid beneficiaries.

Here, neither party disputes that DHS did not provide notice to Aloha when DHS terminated FT's Medicaid benefits. Failure to provide notice thus violated Aloha's due process right to notice.

27

We note that Aloha appealed FT's eligibility determination nearly two years after DHS cut FT's benefits.  Because DHS did not notify Aloha of its adverse decision, though, we hold that the appeal was not untimely.  This does not alter the requirement that facilities that receive notice of an adverse decision based on this case's holding timely appeal the decision.

**2.  Opportunity to be heard**

Skilled nursing facilities have due process rights to be heard regarding the applicant's eligibility.  That is, if the applicant or beneficiary, or an authorized representative is otherwise unwilling or unable to appeal an adverse decision.  This due process right to be heard also means that DHS must hold a contested case hearing – a hearing "required by law."  See MECO, 141 Hawaiʻi at 258, 408 P.3d at 10.  The due process right to a contested case hearing also establishes Aloha's standing to request a contested case regarding FT's eligibility.

Procedural due process requires that parties with property interests have an "opportunity to be heard at a meaningful time and in a meaningful manner."  See id. at 269, 408 P.3d at 21 (cleaned up).  This includes "the right to submit evidence and argument on the issues" involving the asserted property interest.  Id.

28

Because nursing facilities have due process rights based on constitutionally-protected property interests, AAO administrative hearings are "required by law." Id. at 258, 408 P.3d at 10 ("In order for an administrative agency hearing to be 'required by law, it may be required by (1) agency rule, (2) statute, or (3) constitutional due process.'") (quoting Kaleikini v. Thielen, 124 Hawai'i 1, 16–17, 237 P.3d 1067, 1082–83 (2010)). Therefore, those administrative hearings are considered contested case hearings. The Hawai'i Administrative Procedures Act (HAPA) governs these proceedings. See HRS chapter 91; Bush v. Hawaiian Homes Comm'n, 76 Hawai'i 128, 135, 870 P.2d 1272, 1279 (1994) ("The adjudicatory procedures of the Hawaii Administrative Procedure Act apply to hearings which an agency is constitutionally required to provide.") (quoting Aguiar, 55 Haw. at 478, 522 P.2d at 1256) (cleaned up).

When determining the specific procedures required to comply with constitutional due process, we consider and balance three factors: "(1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail." Flores v. Bd. of Land & Nat. Res., 143 Hawai'i 114, 126-27, 424 P.3d 469, 481-82 (2018)

29

(quoting Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261).

Regarding the first factor, the private interest affected is Aloha's $121,831.99 in unpaid Medicaid reimbursements for FT's end-of-life care. Because payment for past Medicaid services is a constitutionally-protected property interest, we consider that interest significant. For the second factor, the risk of erroneous deprivation absent a contested case hearing is high for Aloha because no other party is willing or able to appeal the adverse determination on FT's behalf. Because DHS is required to provide administrative appeals of adverse Medicaid decisions by statute for the "applicant" or "recipient," DHS is not unduly burdened by affording Aloha a contested case hearing. See MECO, 141 Hawai'i at 266, 408 P.3d at 18. As DHS pointed out, it also would have granted a contested case hearing to FT's authorized representative or public guardian. Thus, when no one else is willing or able to appeal, DHS' burden to hold a contested case hearing is slight. See id.

We hold that under the circumstances of this case, the protected interest in reimbursement for Medicaid services performed mandates a DHS hearing to consider FT's Medicaid eligibility. See id. at 269, 408 P.3d at 21. Requiring a contested case hearing directed at FT's eligibility is

reasonable due to the high probability that Medicaid will not reimburse Aloha for its services. See id.

We hold that Aloha has a due process right to a contested case hearing covering FT's eligibility determination.

Because Aloha has a right to a contested case hearing, we also hold that Aloha has standing to request a contested case hearing regarding beneficiary eligibility. See ʻĪao, 128 Hawaiʻi at 241, 287 P.3d at 142.

This court has held that "standing is a prudential concern and not an issue of subject matter jurisdiction[.]" Tax Found. of Hawaiʻi v. State, 144 Hawaiʻi 175, 190, 439 P.3d 127, 142 (2019). Standing is thus "solely an issue of justiciability, arising out of prudential concerns of judicial self-governance." Id. This court's "basic position has been that standing requirements should not be barriers to justice." Life of the Land v. Land Use Comm'n, 63 Haw. 166, 174, 623 P.2d 431, 439 (1981).

When a "person" is entitled to a contested case hearing, they have standing to request a contested case hearing. See Mauna Kea Anaina Hou, 136 Hawaiʻi at 390, 363 P.3d at 238; HRS § 91-1 (Supp. 2017) ("'Persons' includes individuals, partnerships, corporations, associations, agencies, or public or private organizations."). Our holding that Aloha has the due process right to a contested case hearing based on a property

31

interest inherently recognizes that Aloha suffered an actual injury to its constitutional due process rights traceable to DHS' actions, and that DHS holding a hearing on FT's eligibility would provide relief for that injury.  See MECO, 141 Hawai'i at 270, 408 P.3d at 22.  Because DHS is required to hold a contested case hearing regarding FT's eligibility, Aloha has standing to appeal the DHS' eligibility determination.  See id.

Thus, Aloha has standing to request a contested case hearing concerning FT's Medicaid eligibility termination.

**D.    Pipeline retroactive application**

When this court announces a new rule, it may consider prospective versus retrospective application.  See League of Women Voters of Honolulu v. State, 150 Hawai'i 182, 207, 499 P.3d 382, 407 (2021).  This court has identified four degrees of retroactive effect: (1) purely prospective effect ("applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision"); (2) limited or "pipeline" retroactive effect ("the rule applies to the parties in the decision and all cases that are on direct review or not yet final as of the date of the decision"); (3) full retroactive effect ("the rule applies both to the parties before the court and to all others by and against whom claims may be pressed"); and (4) selective retroactive effect ("the court applies the new

rule 'in the case in which it is pronounced, then return[s] to the old [rule] with respect to all [other cases] arising on facts predating the pronouncement'"). Id. at 207 n.39, 499 P.3d at 407 n.39. When deciding whether to give a new rule retroactive effect, this court "weigh[s] the merits and demerits of retroactive application of the particular rule, in light of (a) the purpose of the newly announced rule, (b) the extent of reliance . . . on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards[.]" Id. at 207, 499 P.3d at 407.

We hold that limited or "pipeline" retroactive effect is most appropriate under the circumstances. Our holding establishes important constitutional due process rights for nursing facilities seeking to challenge a resident's Medicaid eligibility. Despite the agency's procedural reliance on HRS § 346-12, HAR § 17-1703.1-3(d)(3), and HAR § 17-1713.1-2, we do not consider it a significant burden for DHS to hold a hearing for similarly situated skilled nursing facilities with cases on direct review. The eligibility determination is fairly narrow, and may not require significant fact finding by the agency in instances where no other party aside from the nursing home is willing or able to appeal an adverse DHS decision. Further, because our holding involves situations where no other party is available to appeal DHS' eligibility decision, we are concerned

that for nursing facilities' cases in the "pipeline," agency decisions will go unreviewed should our holding not apply. Thus, our new rule is prospective in effect, but applies to the parties in the decision and all cases that are on direct review or not yet final on the date of the judgment.

## III.

We vacate both the ICA's judgment, and the Circuit Court of the First Circuit's August 1, 2018 "Order Affirming Administrative Hearing Decision Dated November 20, 2017" and August 1, 2018 Judgment. We remand for a new administrative hearing on the merits of FT's Medicaid eligibility between November 2012 and FT's death.

| | |
|---|---|
| Thomas E. Bush<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Lili A. Young<br>(James W. Walther on the briefs)<br>for respondent | /s/ Todd W. Eddins |
| | /s/ Lisa M. Ginoza |
| | /s/ Vladimir P. Devens |

